1  **FARUQI & FARUQI, LLP**
   David E. Bower (119546)
2  10866 Wilshire Boulevard, Suite 1470
   Los Angeles, CA 90024
3  Telephone: (424) 256-2884
   Facsimile: (424) 256-2885
4  Email: dbower@faruqilaw.com

5  *Attorneys for Plaintiff*

6

7                  **UNITED STATES DISTRICT COURT**

8                  **CENTRAL DISTRIT OF CALIFORNIA**

9

10 | NATALIE GORDON, Derivatively on Behalf of Nominal Defendant EDISON
11 | INTERNATIONAL,                                    | CASE NO. : 14-CV-01058 ODW-ASx
12 |                        Plaintiff,
13 |            v.
14 |
15 | JAGJEET S. BINDRA, FRANCE A. CÓRDOVA, BRADFORD M. FREEMAN,
16 | RONALD L. OLSON, THOMAS C. SUTTON, PETER J. TAYLOR, VANESSA C. L. CHANG,   | **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**
17 | THEODORE F. CRAVER, JR., LUIS G. NOGALES, RICHARD T. SCHLOSBERG, III,
18 | BRETT WHITE, ROBERT L. ADLER, MARK CLARKE, WILLIAM J. SCILACCI  and   | **JURY TRIAL DEMANDED**
19 | BERTRAND A. VALDMAN
20 |                        Defendants,
21 |            and
22 |
23 | EDISON INTERNATIONAL,
24 |                        Nominal Defendant.
25
26
27
28

─────────────────────────────────────────────
VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Natalie Gordon ("Plaintiff"), by and through her attorneys, derivatively on behalf of nominal defendant Edison International ("EIX" or the "Company"), submits this Verified Amended Shareholder Derivative Complaint against the directors and officers named herein (collectively, the "Individual Defendants"). Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief developed from the investigation and analysis of her counsel, which includes, among other things, the review of certain of the Company's Board of Director ("Board") minutes garnered through a request for such information pursuant to California Corporations Code § 1601 and California common law, public filings by EIX with the U.S. Securities and Exchange Commission ("SEC"), as well as, press releases, news reports, analyst reports, complaints pending against the Company in state and federal courts, and other information available in the public domain.

## I.      NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant EIX against certain members of its Board and executive officers seeking to remedy defendants' breaches of fiduciary duties.

2.      EIX was incorporated on April 20, 1987, under the laws of the State of California for the purpose of becoming the parent holding company of Southern California Edison Company ("SCE"), a California public utility corporation, Edison Mission Energy ("EME"), an independent power producer, and Edison Capital, an infrastructure finance company. EME is an indirect, wholly-owned subsidiary of EIX.

3.      Since its founding in 1986, EME has functioned not as an independent company looking out for the best interest of its investors but as EIX's own personal piggy bank. This has been allowed to occur because EME's officers and directors have been personally hand-picked by EIX with the purpose of operating EME for EIX's sole benefit.

4.      For years, EIX has personally profited from its various subsidiaries by ordering these companies to make capital payments or pay dividends for EIX's benefit. For example, in

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

2007, EIX directed EME to pay a dividend of $899 million to its corporate parent Mission Energy Holding Company ("MEHC"), so that MEHC could pay off senior note obligations that were due. This transaction harmed EME because EME was forced to pay this dividend payment by issuing its own senior notes. EME was forced to make the payment and took on the interest expense associated with the senior notes, at a period when EME was nearly insolvent. Moreover, EME was not an obligor on MEHC's senior notes and MEHC did not guarantee EME's new senior notes. Therefore, while this transaction clearly benefitted MEHC, and EIX, by reducing the interest expense for the overall EIX organization, it clearly provided no apparent benefit to EME as EME's eventual bankruptcy was now a foregone conclusion.

5. In addition to the fact that EME now had billions of dollars in debt obligation, at the end of 2008, EME's business began to suffer as the coal industry declined. As EME's financial condition worsened and became public news, EIX's stock price declined, due in part to the fact that the market and investors believed that EIX would have to contribute capital to support EME. Around this time, the Individual Defendants started scrambling to protect EIX's interests and distance EIX from EME as it was clear that EME would have problems making the required payments due on its senior notes. As a result in or around 2009, EIX's Chief Executive Officer, President and Chairman of the Board Theodore F. Craver ("Craver") began publicly stating that EIX would not give any more capital to EME causing EIX's stock price to increase, but leaving EME with no solution to the cash crisis foisted upon it by the Individual Defendants.

6. By 2011, EME continued to have significant financial problems, including but not limited to, an imminent cash crunch as well as revolving credit lines that would terminate in 2012 and $500 million in senior notes set to mature in 2013.

7. Despite having essentially bled EME dry, the Individual Defendants showed no remorse to EME's position and instead made the decision to have EIX abandon EME by allowing EME to file for chapter 11 bankruptcy and deconsolidate EME from the EIX empire. Before discarding EME by the wayside, however, the Individual Defendants caused EIX to engage in one

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

last scheme to take full financial advantage of EME, and simultaneously putting EIX in harm's way.

8.   The Individual Defendants did this by having EIX make one last unwarranted cash withdrawal of $183 million from EME under tax sharing agreements by and between the various EIX entities and then subsequently amending the tax sharing agreements to terminate EME, effectively stripping EME of billions of dollars in crucial payments over the next few years. Again, the sole purpose of this transaction was to funnel cash to EIX at the expense of EME and its creditors, including a very powerful block of senior noteholders whose very existence was the product of the Individual Defendants' wrongdoing.  EIX was able to carry out this scheme by exploiting its parent position over EME since EIX's own high-level executives also sat on the EME Board of Directors and were instructed to act solely for the benefit of EIX, to the detriment of EME.

9.   As the Individual Defendants knew would happen, EME entered bankruptcy, and the ramifications of this bankruptcy for both EME and EIX have been severe.  In connection with EME's Chapter 11 bankruptcy proceeding which involved an investigation into EME's insolvency, the committee of EME's unsecured creditors (the "Creditors' Committee") filed a motion requesting the right to sue EIX, claiming the Company drained EME of billions of dollars in value. Specifically, the Creditors Committee sought bankruptcy-court approval to pursue legal claims related to the "abusive domination and control" of EME by EIX and to recover, among other things, the billions of dollars EME transferred to EIX plus additional compensatory and punitive damages.  The Creditors' Committee's motion was supported by the Ad Hoc Committee of Senior Noteholders (the "Ad Hoc Group").  As noted in the Creditor Committee's motion, the Ad Hoc Group represents approximately $2.8 billion of the claims at EME and the vast majority of those claims, approximately $1.9 billion, arise from the notes forced upon EME by the Individual Defendants' scheme to unburden MEHC of its debt to the detriment of EME.  In addition, EME also indicated to the bankruptcy court that it was prepared to make similar allegations against EIX.

10. Due to the culpability of the Individual Defendants, on February 18, 2014 EIX had no choice but to enter into a settlement agreement with EME and a majority of EME's senior unsecured noteholders, resolving all the claims between EME and EIX relating to EME's bankruptcy (the "Settlement Agreement").  The Settlement Agreement will be incorporated into EME's Plan of Reorganization.

11. Under EME's proposed Chapter 11 Plan of Organization, EIX loses almost all of EME's business and assets as substantially all of the assets of EME are to be sold to NRG Energy, Inc. ("NRG Energy") for $2.64 billion. Had the Individual Defendants not forced EME to incur MEHC's debt, EME would never had had to declare bankruptcy and been deconsolidated from the EIX enterprise in the first place thus EIX would have been able to retain EME's assets, or at least, not been forced to watch EME sell its assets to NRG for what analysts agree is a paltry purchase price.

12. Under the Settlement Agreement, EIX will continue to own EME as an indirect, wholly owned subsidiary and EME will be free and clear of liabilities once the EME reorganization is completed.

13. Upon the approval of the Plan of Reorganization, all assets and liabilities of EME that are not otherwise discharged in the bankruptcy or transferred to a subsidiary of NRG Energy will be transferred to a newly formed trust or other entity under the control of EME's existing creditors.  EME is expected to have an estimated $1.2 billion of unused tax attributes, mainly net operating losses and tax credits, once EME's reorganization is completed.

14. Pursuant to the Settlement Agreement, EIX has agreed to pay the trust or entity controlled by EME's creditors 50% of the amount of unused tax attributes plus interest for deferred payments.  Thus, under the terms of the Settlement Agreement, EIX is required to pay EME's creditors a payment estimated to be ***$634 million plus interest***, money that EIX always had rights to under tax sharing agreements and would never have been paid if the Individual Defendants had not breached their fiduciary duties.

15.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly engaging in the illicit scheme against EME alleged herein, which has caused EIX to sustain damages, including but not limited to, the loss of EME's assets and/or the loss of EME's assets at a discounted purchase price, the costs and expenses incurred as a result of the litigation against EIX and the payment of $634 million to EME's creditors.  Moreover, this payment took place even though EIX and the Individual Defendants have always maintained that EIX was not and is not responsible for the debts of EME.

## II.      JURISDICTION AND VENUE

16.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332. All defendants are completely diverse from the plaintiff and the amount in controversy exceeds $75,000.00.

17.     This Court has personal jurisdiction over each of the defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the defendants either resides or maintains executives offices in the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

## III.     THE PARTIES

19.     Plaintiff is a shareholder of EIX, was a shareholder of EIX at the time of the wrongdoing complained of herein, and has been a shareholder of EIX continuously since that time. Plaintiff is a citizen of the State of New York.

20.     EIX is a California corporation that maintains headquarters in Rosemead, California.  EIX, through its subsidiaries, generates and distributes electric power. The Company also invests in transportation infrastructure and energy assets, including renewable energy.

21.     Defendant Jagjeet S. Bindra ("Bindra") has been a director of EIX and Southern California Edison Company ("SCE") since 2010.  Upon information and belief, Bindra is a citizen of the State of Texas.

22.     Defendant France A. Córdova ("Córdova") has been a director of EIX and SCE since 2004. Upon information and belief, Córdova is a citizen of the State of New Mexico.

23.     Defendant Bradford M. Freeman ("Freeman") has been a director of EIX and SCE since 2002.  Upon information and belief, Freeman is a citizen of the State of California.

24.     Defendant Ronald L. Olson ("Olson") has been a director of EIX and SCE since 1995.  Upon information and belief, Olson is a citizen of the State of California.

25.     Defendant Thomas C. Sutton ("Sutton") has been a director of EIX and SCE since 1995.  Upon information and belief, Sutton is a citizen of the State of Michigan.

26.     Defendant Peter J. Taylor ("Taylor") has been a director of EIX and SCE since 2011.  Upon information and belief, Tayor is a citizen of the State of California.

27.     Defendant Vanessa C. L. Chang ("Chang") has been a Director EIX and SCE since 2007.  Upon information and belief, Chang is a citizen of the State of Texas.

28.     Defendant Craver has been the Chairman of the Board, President, and Chief Executive Officer of EIX since 2008. He has been a Director of EIX since 2007 and of SCE since 2008. He served as Chairman of the Board, President and Chief Executive Officer of Edison Mission Group ("EMG") from 2005 to 2008, and, prior to that, Executive Vice President, Chief Financial Officer and Treasurer of EIX.  Upon information and belief, Craver is a citizen of the State of California.

29.     Defendant Luis G. Nogales ("Nogales") has been a director of EIX and SCE since 1993.  Upon information and belief, Nogales is a citizen of the State of California.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

30.     Defendant Richard T. Schlosberg, III ("Schlosberg") has been a director of EIX and SCE since 2002.  Upon information and belief, Schlosberg is a citizen of the State of Texas.

31.     Defendant Brett White ("White") has been a director of EIX and SCE since 2007.  Upon information and belief, White is a citizen of the State of California.

32.     Defendant Robert L. Adler ("Adler") is executive vice president and general counsel for EIX. He joined EIX on July 1, 2008. Adler was a director of EME from August 1, 2008 to 2012.  Prior to joining EIX, Adler was a partner at Munger, Tolles & Olson LLP, where he represented EIX.  Upon information and belief, Adler is a citizen of the State of California.

33.     Defendant Mark Clarke ("Clarke") is vice president and controller of EIX. Prior to his current role, Clarke was vice president and controller for EMG, which he joined in 1999.  Clarke was a director of EME during the 2012 period.  Upon information and belief, Clarke is a citizen of the State of California.

34.     Defendant William J. Scilacci ("Scilacci") has served as EIX's executive vice president, chief financial officer ("CFO") and treasurer since August 2008.  Scilacci previously was senior vice president and CFO for three years for EMG.  Prior to joining EMG, Scilacci was senior vice president and CFO of SCE.  He joined SCE in 1984, was elected vice president and CFO in January 2000, and was elected senior vice president and CFO in January 2003.  Scilacci was a director of EME from August 1, 2008 to 2012.  Upon information and belief, Scilacci is a citizen of the State of California.

35.     Defendant Bertrand A. Valdman ("Valdman") is senior vice president of strategic planning for EIX.  Valdman was a director of EME during the 2012 period.  Upon information and belief, Valdman is a citizen of the State of Washington.

36.     Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, White, Adler, Clarke, Scilacci and Valdman are referred to collectively herein as the "Individual Defendants."

**IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS**

37.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

- exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

- exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with the Company's by-laws and all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

- when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

9

40.     At all relevant times thereto, Adler, Clarke, Craver, Scilacci and Valdman as officers of the Company were bound by EIX's Employee Ethics and Compliance Code ("Employee Code").  The Employee Code states in relevant part:

**Fair Dealing**

We always should treat those with whom we work or do business fairly, honestly, and straightforwardly. We must never take unfair advantage of others through manipulation, concealment, abuse of privileged and confidential information, or misrepresentation. Our duty to act fairly extends to our customers, suppliers, contractors, competitors, coworkers, regulatory agencies, investors, and communities. Fairness is at the heart of our value of Respect.

**Complying with Laws, Rules, Regulations, and Policies**

*Edison employees must adhere to all laws, regulations, and other legal requirements that apply to our business. We can be a company and people with integrity only if we obey the law.*

*Guiding Principles on Legal and Regulatory Compliance*

Our businesses are governed by many laws, rules, regulations, and regulatory decisions. We are regulated by the Federal Energy Regulatory Commission (FERC), California Public Utilities Commission (CPUC), Securities and Exchange Commission (SEC), Nuclear Regulatory Commission (NRC), North American Electric Reliability Corporation (NERC), as well as federal and state environmental and occupational safety, health, and other agencies. While no one person could know every law, rule, or regulation, as a company we are accountable for obeying them all. There are no exceptions. You should become familiar with the legal and regulatory requirements that apply to your job and to the jobs of any employees who report to you. You also are expected to seek appropriate legal guidance and training as necessary in areas that relate to your responsibilities. We all share the responsibility for detecting and preventing noncompliance with legal and regulatory requirements. We also share the responsibility for reporting any actual or suspected noncompliance. We are honest and straightforward in our discussions with regulatory agency representatives and government officials. During investigations, audits, and other inquiries, we fully cooperate with appropriate requests for information under the guidance of the Law Department.

**Conflicts of Interest**

*We are expected to act in Edison's best interests. We should never use our position at Edison improperly to benefit personally or to benefit someone else or other organizations at the expense of Edison. Avoiding conflicts of interest is a key aspect of acting with integrity and striving for excellence.*

*Avoiding Conflicts of Interest*

Situations where you may have a personal interest or potential gain that could be inconsistent with the company's best interests may involve a conflict of interest. We must avoid conflicts of interest.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

We also should be wary of activities and relationships that could reasonably create the appearance of a conflict.

Conflicts are likely if you are in a position to gain financially from decisions you make on behalf of the company or if a family member, relative, or friend is involved or could gain financially. We are expected to make those decisions unclouded by personal interests.

You should report any potential conflict of interest to your manager or supervisor and resolve the conflict before proceeding. Even in cases where you believe no conflict is present, but you are aware there may be an appearance of a conflict, you should disclose and discuss this issue with your manager or supervisor.

41.     Finally, at all relevant times thereto, Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White as directors of the Company were bound by EIX's Directors Ethics and Compliance Code ("Director Code").  The Employee Code states in relevant part:

**CONFLICTS OF INTEREST**
Directors are expected to avoid any actual conflicts of interest between them and the Company. In addition, Directors should also avoid even the appearance of a conflict of interest. Situations, including those with suppliers, contractual counterparties, competitors or charitable organizations, where a Director may have a personal interest or potential gain that is inconsistent with the Company's best interests or make it difficult for the Director to exercise objective judgment may involve a conflict of interest. Conflicts of interest may also arise when a Director, or member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company.

**COMPLIANCE WITH APPLICABLE LAWS**
Directors must conduct all their financial, business and other activities in full compliance with applicable laws, rules and regulations.

**FAIR DEALING**
Directors shall endeavor to deal fairly with the Company's employees, customers, suppliers and competitors. Directors shall not take unfair advantage through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

V.     **FACTS**

A.     **EIX's Domination and Control of EME**

42.     At all relevant times hereto, EIX has dominated and controlled EME and its other various subsidiaries.  EIX has two business segments for financial reporting purposes: an electric utility operation segment (SCE) and a competitive power generation segment (EMG).

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

43.     SCE is an investor-owned public utility primarily engaged in the business of supplying electricity to an approximately 50,000-square-mile area of southern California. EMG is the holding company for its principal wholly owned subsidiary, EME. EME is also a holding company with subsidiaries and affiliates engaged in the business of developing, acquiring, owning or leasing, operating and selling energy and capacity from independent power production facilities. EME's operating projects primarily consist of coal-fired generating facilities, natural gas-fired generating facilities and renewable energy facilities, which include wind projects and one biomass project.

44.     There are two levels of holding companies between EME and EIX:  1) EME's parent company, MEHC, which owns 100% of EME's common stock and; 2) EMG, which owns 100% of MEHC's common stock.  EIX owns 100% of EMG.

45.     Below is a chart demonstrating the EIX structure of its various subsidiaries:

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



46.     EIX has always controlled EME and its management.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

47.     From 2004 to 2012, EME's Board always consisted of three directors which included the President of EME, the CFO of EIX and the General Counsel of EIX.

48.     EIX used EME as its personal training ground for EIX executives thus ensuring that EME employees would always have EIX's interests at heart.  EIX employees were regularly sent to EME to serve in senior positions before then being placed in executive officer positions at EIX and SCE.  EIX also continuously alternated senior positions in EME thus ensuring that EME executives had loyalty to EIX first before EME.

49.     The goal was made clear to all EME employees – promotion to a position at EIX. This way, EIX ensured that EME officers were always concerned about what was best for EIX, not EME. This was in addition to the fact that the EIX Board has always approved the executive compensation for EME officers ensuring EME officers' utmost devotion.  *See* February 25, 2010 EIX Board Meeting Minutes attached hereto as Exhibit A at 6 [EIX000257-263]; February 23, 2012 EIX Board Meeting Minutes attached hereto as Exhibit B at 5 [000003-8]; February 24, 2011 EIX Board meeting minutes  attached hereto as Exhibit C at 7 [EIX000009-15].

50.     In fact, some of the Individual Defendants are prime examples of EME officers who were eventually "promoted" to EIX officers.  Craver was EIX's CFO and Treasurer from January 2000 through December 2004, before he became Chairman, President and CEO of EME.  Craver served as at these positions at EME from January 2005 through April 2008, when he was eventually appointed to his current positions of President and Chairman of EIX.   Likewise, Scilacci served as Senior Vice President and CFO at SCE from January 2003 through 2005 before he was appointed CFO of EME in 2005.  He was EME's CFO from 2005 until August 2008 until he was eventually promoted to his current position as CFO of EIX.

51.     Third, EIX always represented that it and EME were one company.  In EME's public filings, EME always referred to itself a subsidiary of "Edison International" and EME and EIX shared similar logos.  EIX's financial reports were also telling because EIX's annual reports contained consolidated financial statements for EIX and its subsidiaries and affiliated companies (the "Consolidated Group") including EME and listed EME's senior notes as part of EIX

1  Consolidated Group's long term debt. Lastly, EIX always publicly represented to the public and

2  analysts that if necessary, EIX would support EME by making capital contributions to EME so that

3  EME could meet its debts.

4       **B.    EIX Causes EME to Pay Illegal Dividends to MEHC**

5       52.    In 2006, EIX was publicly representing that it would contribute capital to EME. The

6  market reacted favorably to this news and as a result, S&P upgraded its credit rating of EME.

7       53.    The truth of the matter was that EME was in desperate need of cash from EIX by

8  the end of 2006.  In EME's Form 10-K for the 2006 fiscal year, EME reported total assets of $7.25

9  billion and total liabilities of $4.6 billion. Additionally, EME was responsible for approximately

10  $2.9 billion in additional capital expenditures in connection with Midwest Generation, LLC

11  ("Midwest Generation"), one of EME's subsidiaries.

12      54.    On December 12, 2006, EME disclosed an agreement in principle with the Illinois

13  Environmental Protection Agency to reduce certain emissions at Midwest Generation's Illinois

14  plant.  EME forecast that approximately $2.7 to $3.4 billion would have to be spent to meet these

15  requirements.

16      55.    EME's financial condition did not improve in fiscal year 2007.  In EME's Form 10-

17  K for the 2007 fiscal year, EME reported total assets of $7.3 billion and total liabilities of $5.3

18  billion, however, EME was also still on the hook for the $2.9 billion in additional capital

19  expenditures with regard to Midwest Generation making it real liabilities at least $8.2 billion.

20      56.    At this same time, MEHC had outstanding senior notes due.  In July 2001, MEHC

21  issued $800 million of 13.50% senior secured notes due 2008.  MEHC was the sole obligor on its

22  13.5% notes and EME, nor any of its subsidiaries, had any obligation to make payment in

23  connection with the notes.

24      57.    Despite the fact that EIX knew that EME was in actuality insolvent, EIX caused

25  EME to pay two dividends totaling approximately $924 million to MEHC in order to pay off

26  MEHC's notes.

27

28
_____
VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

58.     The first dividend payment occurred in January 2007 when EIX caused EME to pay a total of $25 million in dividends to MHE ("January 2007 Dividend").  MEHC used the proceeds of the January 2007 Dividend to make payments on its senior secured notes.

59.     The January 2007 Dividend, however, was not enough to dig MEHC out of its hole. Thus, the second dividend, in the amount of $899 million, occurred in May 2007 (the "May 2007 Dividend" and collectively with the January 2007 Dividend the "Dividends") and while the May 2007 Dividend eliminated MEHC's debt it severely weakened EME's financial condition.

60.     According to EME's Form 10-K for fiscal year 2007:

In May 2007, EME completed a private offering of $1.2 billion of its 7.00% senior notes due May 15, 2017, $800 million of its 7.20% senior notes due May 15, 2019 and $700 million of its 7.625% senior notes due May 15, 2027. EME used the net proceeds, together with cash on hand, to repay debt and make a dividend payment of $899 million to MEHC, which enabled MEHC to purchase substantially all of its 13.5% senior secured notes due 2008. In June 2007, MEHC redeemed in full its senior secured notes.

61.     Notably, EME had the ability to raise these funds due, in part, to its upgraded credit rating which was the result of EIX's strategic planning to make false representations to the market that it would give EME capital funding to help EME's financial condition.

62.     EIX was allowed to order EME to go through with this transaction because the EME Board was stacked with EIX insiders. Specifically, on the EME Board at that time was defendant Craver (currently EIX's CEO), Thomas R. McDaniel ("McDaniel") (then EIX's CFO) and J.A. Bouknight, Jr. ("Bouknight") (then EIX's General Counsel). EIX officers McDaniel and Bouknight not only controlled EME's board but also MEHC's board as MEHC's board consisted of McDaniel, Bouknight and John E. Bryson (then EIX's CEO and Chairman of MEHC's board).

63.     As a result of the Dividends, EIX's Board comprised of defendants Cordova, Freeman, Olson, Sutton, Nogales and Schlosberg and defendant Craver who was also a EME director knowingly burdened EME with roughly $924 million in debt.  The Dividends were unfair to EME because it received no consideration from MEHC from this exchange.  EME was never an

obligor or guarantor on the debt repaid by MEHC and MEHC did not provide a guarantee of EME's new debt obligations.

64.    In sum, the Dividends allowed MEHC to pay its senior notes in full while reducing the EME's assets by approximately $924 million.  Egregiously, these transactions were done at time when EME was already on the brink of insolvency, if not actually insolvent.  Unfortunately, for EME creditors, the payment of the Dividends ensured that EME would not be able to pay its own burgeoning debt when it became due and made EME's bankruptcy an eventuality.

65.    Moreover, the senior noteholders who purchased EME's senior notes went on to make up a majority of the unsecured debt in EME's bankruptcy and supported the Creditors' Committee's attack on EIX which resulted in a $634 million payment to EME's unsecured creditors by EIX.  A payment for which EIX should never have been responsible for.

**C.    EIX Reasserts Control Over EME's Board and its Financial Alternatives**

66.    Starting in 2009, due to, among other things, uncertain market conditions and increased capital expenditures EME's performance was significantly declining.  Since EIX had always represented to the market that it was one company with EME, the market believed that EME would receive additional capital from EIX.  As a result, EIX's stock price likewise started to decline.

67.    Realizing that EME's performance was harming EIX's stock price, defendant Craver, who was now CEO of EIX, started representing to analysts and the market that EIX would not contribute capital to EME to help the company financially recover. As a result, EIX's stock price started to rebound while EME's bond prices continued to fall.

68.    By mid-year 2010, the market saw the writing on the wall that EME was in serious financial trouble and faced severe liquidity problems due to the fact that $500 million of EME's senior notes would mature in 2013, and EME would not have enough cash to pay this debt.

69.    At all times the Board was well aware of EME's dire financial condition as the Board was continuously updated regarding EME's financial condition, including its risks, current capital and future forecast.  *See* February 25, 2010 EIX Board Meeting Minutes attached hereto as

1   Exhibit A at 2 [EIX000257-263]; April 22, 2010 EIX Board Meeting Minutes attached hereto as

2   Exhibit D at 2 [EIX000264-269]; December 9, 2010 EIX Board Meeting Minutes attached hereto

3   as Exhibit E at 3 [EIX000244-250]; December 8, 2011 EIX Board Meeting Minutes attached

4   hereto as Exhibit F at 2, 4 [EIX000270-275].

5         70.     Further statements by EIX that it would not help EME with its financial debt,

6   further served to increase EIX's stock price while again sending EME's bonds price downward.

7   Nonetheless, by mid-2012 it was the EIX Board calling the shots and negotiating with EME's

8   noteholders.  *See* EIX's February 23, 2012 Board meeting minutes attached hereto as Exhibit B at

9   2 [EIX000003-8] ("The EIX Board and management discussed...potential EMG discussions with

10  bondholders.  The EIX Board commended EMG's management's work in addressing the issue");

11  EIX's September 6, 2012 Board meeting minutes attached hereto as Exhibit G at 3 [EIX 000183-

12  188].

13        71.     Indeed, in May 2012, defendant Craver was openly telling the market that it was

14  EIX, not EME that was negotiating with EME's senior noteholders making clear that EIX was

15  controlling EME and deciding EME's financial fate, a fact that should surprise no one given the

16  vast majority of EME's senior noteholders very existence was due to the Individual Defendants'

17  misuse of EME.

18        72.     In July 2012, EME also expanded its Board.  In light of EME's worsening financial

19  condition and EME's 2013 note maturity date looming, EIX decided to stack EME's Board with

20  additional EIX insiders to ensure complete control.  On July 10, 2012, four directors were added to

21  the EME Board: non-EIX executives Frederic F. Brace and Hugh E. Sawyer and EIX executives

22  Clarke (EIX's Controller) and Valdman (EIX's Senior Vice President for Strategic Planning).

23        73.     At this time, EME's Board already consisted of the following: EIX's CFO Scilacci,

24  EIX's General Counsel Adler and EME President Pedro Pizarro ("Pizarro").  Notably, Pizarro was

25  always in EIX's pocket and never had EME's best interests at heart due to the fact that his

26  executive pay has always been approved by EIX's Board.  *See* EXI's June 23, 2011 Board meeting

27  minutes attached hereto as Exhibit H at 2 [EIX 000165-167].

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**D.     The Tax Sharing Agreements Were EME's Most Valuable Asset**

74.     As discussed above, the Consolidated Group filed a single, consolidated federal income tax return (and similar state tax returns) that enabled the group to offset the taxable income of one member with losses from one another.  In the Consolidated Group, the terms apportioning tax expenses and benefits amongst the Consolidated Group are set forth in certain tax sharing agreements (the "Tax Sharing Agreements").  Pursuant to the Tax Sharing Agreements, the taxable gains and losses of each subsidiary are usually calculated independently, but companies with gains who owe taxes are able to offset those gains with the losses of other companies who are party to the Tax Sharing Agreements.  Generally, this results in subsidiaries with gains being required to make payments to members of the group with operating losses as a fee for the tax payment offsets.  As a result, EME through payments received via the Tax Sharing Agreements, had been able to mitigate some of its operational losses during its recent financially unsuccessful period.

75.     EME had not been performing well for the past few years.  At the same time, other members of the Consolidated Group that normally generate taxable income have had tax losses due to bonus depreciation rules.  Thus, losses have been carried forward to future periods rather than being monetized on a current basis.  Accordingly, EME anticipated that payments to it under the Tax Sharing Agreements would be a significant cash flow in the next coming years.  For instance, in 2009, EME received $187 million under the Tax Sharing Agreements for its 2009 federal tax benefits.

76.     Given that the Tax Sharing Agreements were projected to generate significant liquidity in the coming years, the Tax Sharing Agreements were an important asset to EME.  EME, however, could only realize the benefit of the Tax Sharing Agreements if EME continued to be part of the EIX enterprise and the Tax Sharing Agreements remained valid.

77.     The Board always had full knowledge the Tax Sharing Agreement and its importance to EME given the Board was always kept apprised of EME "tax issues."  *See* September 2, 2010 EIX Board Meeting Minutes attached hereto as Exhibit I at 4 [EIX177-182].

**E.     EIX  Wrongfully Causes EME To Make An $183 Million Payment Under The Guise of the Tax Sharing Agreements**

78.     From around 2005 to 2008, EME was a net provider to EIX's earnings and produced tax obligations for which it made payments to EIX. However, by 2009, EME was on the brink of insolvency and therefore had produced net losses.  Under  the Tax Sharing Agreements, when filing tax returns EIX had used EME's net losses to shield a significant amount of otherwise taxable income generated by other Consolidated Group members, particularly SCE.

79.     Even though EME continued to produce net losses and EME's bankruptcy was imminent, EIX decided to take money from EME under the guise of the Tax Sharing Agreements. On September 27, 2012, a few months before EME filed for Chapter 11 bankruptcy in December 2012, EIX caused EME to pay EIX approximately $183 million in a tax sharing payment (the "Tax Sharing Payment") which EIX then paid to SCE.  It is reasonable to assume that the improper Tax Sharing Payment was discussed by the Board in the months leading up to the payment. *See* June 21, 2012 EIX Board meeting minutes   attached hereto as Exhibit J at 1 [EIX000037-39] (Defendants Craver, Bindra, Chang, Córdova, Freeman, Nogales, Olson, Schlosberg, Sutton, Taylor, Adler, Scilacci, Valdman and White discussed "new growth opportunities, EIX capital allocation" and "EME strategy").

80.     There was no credible reason for EIX to cause EME to make this payment under the Tax Sharing Agreement. Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, and White as EIX and SCE directors together with Adler, Clarke, Scilacci and Valdman as EME directors designed and executed the Tax Sharing Payment knowing that EME's finances were severely strained and that bankruptcy was already a foregone conclusion for EME. The Individual Defendants approved the Tax Sharing Payment to drain whatever assets it could from EME before it filed for bankruptcy.

81.     The sole purpose of this transaction was to funnel cash to SCE and the EIX enterprise at the expense of EME and its creditors.  The Individual Defendants simply decided to put EIX ahead of EME's creditors.  They decided the $183 million looked better in the pockets of

EIX than EME's creditors.  The problem of course is the Individual Defendants chosen course of action ended up putting $634 million in the pockets of EME's creditors.

82.     In fact, the Individual Defendants' actions clearly violated 11 U.S.C. § 548 of the Bankruptcy Code which states:

**(a)**

**(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

**(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

**(B)**

**(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and

**(ii)**

**(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . .

**(IV)** made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

83.     It was undeniably clear to the Individual Defendants that the Tax Sharing Payment would run afoul of the Bankruptcy Code's prohibition against fraudulent transfers.

84.     There was no justification for EME to have made the Tax Sharing Payment since the Tax Sharing Payment was not required of EME under the Tax Sharing Agreements. Moreover,

1   at that time, EME owed interest payments of $97.5 million due on certain of its senior notes on

2   November 15, 2012 and $38.1 million on certain other senior notes due December 15, 2012.  $500

3   million of senior notes were additionally set to mature in 2013.

4          85.   At the time of the Tax Sharing Payment, the Board was well aware of EME's

5   financial problems, including EME's looming debt problems, since discussions regarding EME's

6   financing plans and forecasts were routinely discussed throughout the years leading to the Tax

7   Sharing Payment. *See* June 24, 2010 EIX Board meeting minutes attached hereto as Exhibit K at 4

8   [EIX000168-171] ("management and the Board engaged in an extensive review and discussion

9   of...EMG's strategic alternatives, and EIX, SCE and EMG financial forecasts"); February 24, 2011

10  EIX Board meeting minutes attached hereto as Exhibit C at 5 [EIX000009-15] (reported on

11  "updates to the SCE and EME 2011 financing plans").

12         86.   The Board was particularly knowledgeable that EME could not meet its notes

13  obligations when they came due having had numerous discussions regarding EME's notes debt. In

14  a March 18, 2011 Board meeting, defendants Craver, Bindra, Chang, Córdova, Freeman, Olson,

15  Schlosberg, White, Adler, Valdman and Scilacci were informed on EME's "debt maturities." *See*

16  March 18, 2011 EIX Board meeting minutes  attached hereto as Exhibit L at 2 [EIX000020-21];

17  *see also* April 26, 2011 EIX Board meeting minutes attached hereto as Exhibit M at 2 [000024-28]

18  (Board was updated on "EMG liquidity and financing options" and "external experts retained to

19  provide advice on liquidity issues, tax issues affecting EMG liquidity, and potential restructuring

20  options"); May 25, 2012 EIX Board Meeting Minutes attached hereto as Exhibit N at 2

21  [EIX000035-36] (defendant Adler provided an "update on EMG, including the status of

22  engagement with Edison Mission Energy bondholders").

23         87.   Likewise, in a Board meeting held on September 6, 2012, a mere 21 days before the

24  Tax Sharing Payment occurred, defendant Adler was reporting to the EIX Board (defendants

25  Craver, Bindra, Chang, Córdova, Freeman, Nogales, Olson, Schlosberg, Sutton, Taylor and White)

26  and defendant Scilacci on the "EME Restructuring Report." *See* Exhibit G at 3. Specifically,

27  defendant Adler reported to the Board with regard to "the EME restructuring process, discussions

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

with EME bondholders' advisors and factors affecting EIX's position in negotiations with the advisors." *Id.* Defendant Craver, in turn, "commented on EIX's position in negotiations with EME bondholders' advisors." *Id.* The EIX Board was also informed of "EME's liquidity and business conditions." *Id.* at 4.

88.     Thus, there is no doubt that the Board was intimately familiar with EME's financial crisis and was being continuously informed regarding EME's restructuring such that they knew that EME was insolvent and could not meet its obligations as they came due.  Despite this knowledge, the Board still improperly transferred $183 million to EIX via the Tax Sharing Payment causing significant harm to EME and its creditors.

## F.     Immediately After EME Pays the Tax Sharing Payment the Individual Defendants Strip EME of the Tax Sharing Agreements

89.     Once EIX received the Tax Sharing Payment, Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, White, Adler, Clarke, Scilacci and Valdman saw no further use for EME.  To add insult to injury, despite the fact that EME paid the Tax Sharing Payment to EIX under the Tax Sharing Agreements, a little over a month later, EIX sent written notice to EME via EMG that the Tax Sharing Agreements would terminate with respect to EME on December 31, 2012.  That same day, Clarke as President of EMG executed a modification of the Tax Sharing Agreements terminating them with regard to EME effective December 31, 2013.  As a result, EME would no longer receive any payments from EIX and its subsidiaries for any net losses produced by EME therefore causing EME to be cut off from all benefits after December 31, 2013.

90.     To review, the Board (defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White), who are also SCE directors, and defendants Adler, Clarke, Scilacci and Valdman as EME directors caused EME to pay an unwarranted $183 million payment under the Tax Sharing Agreements to SCE via EIX and once this improper transaction occurred, they immediately terminated the Tax Sharing Agreement with respect to

1   EME.  As discussed above, the Tax Sharing Agreements were EME's most valuable asset as the

2   payments from the Tax Sharing Agreements were expected to bring substantial revenue to EME

3   for the next couple of years.

4           91.     The Individual Defendants also sought to manipulate the timing of EME's

5   bankruptcy filing to EIX's advantage, specifically delaying commencement of the bankruptcy so

6   that EIX could adversely amend the Tax Sharing Agreement to provide for termination of EME's

7   participation in the Tax Sharing Agreement, before the bankruptcy was initiated. Notably, at the

8   time EME was stripped of its interest in the Tax Sharing Agreement EIX controlled the EME

9   Board and therefore had authority over the timing of EME's bankruptcy.

10          92.     Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver,

11  Nogales, Schlosberg, and White as EIX and SCE directors together with Adler, Clarke, Scilacci

12  and Valdman as EME directors exerted their controls over EME to ensure that the Tax Sharing

13  Agreements were in place at the time EME made the $183 million payment before allowing EME

14  to file for bankruptcy.  This is demonstrated by the fact that during an October 25, 2012 EIX Board

15  meeting attended by defendants Craver, Bindra, Chang, Córdova, Freeman, Nogales, Schlosberg,

16  Sutton, Olson and White, defendant Adler discussed with defendant Scilacci and the Board

17  "governance changes likely to result from an EME bankruptcy" and "personnel and tax impacts."

18  *See* October 25, 2012 EIX Board meeting minutes attached hereto as Exhibit O at 2 [EIX000228-

19  232].

20          93.     A filing for a Chapter 11 bankruptcy would have protected EME and its creditors

21  because EIX would not have been able to terminate the Tax Sharing Agreements unless it could

22  establish adequate grounds to obtain relief from the automatic stay placed on bankruptcy cases and

23  obtain bankruptcy court approval to terminate the agreements.  The Individual Defendants, who

24  only had EIX's interests at heart, obviously could not allow this happen.

25      **G.     EME Files For Bankruptcy**

26          94.     Due to EIX forcing EME to make the Tax Sharing Payment, EME could not make

27  payments on its senior notes specifically a scheduled $97.5 million interest payment due

28

November 15, 2012.  The 30 day payment grace period expired on December 15, 2012, when EME was supposed to make an additional $38.1 million interest payment on other senior notes. These are payments that could easily have been made but for the $183 million Tax Sharing Payment.  Having failed to make these payments, EME filed for bankruptcy on December 17, 2012.

95.    On the day before EME filed its bankruptcy petition, December 16, 2012, EIX, EMG, MEHC, EME, and the ad hoc committee of holders of EME's senior notes (the "Ad Hoc Group") entered into the Transaction Support Agreement.  The Transaction Support Agreement was approved by the Board (defendants Craver, Bindra, Chang, Córdova, Freeman, Nogales, Olson, Schlosberg, Sutton, Taylor and White) at the December 13, 2012 Board meeting which was also attended by defendants Adler, Scilacci, Valdman.  *See* December 13, 2012 EIX Board meeting minutes attached hereto as Exhibit P at 2 [EIX000251-256].

96.    The purpose of the Transaction Support Agreement was for the Individual Defendants to avoid liability with regard to their part in defrauding EME and its creditors.  Under the terms of the Transaction Support Agreement, EIX, EMG and MEHC would permit EME to remain in the Consolidated Group and receive payments due under the Tax Sharing Agreements until December 31, 2014. In return, EME was required to give ***full releases*** of EIX, EMG and MEHC, and each of their officers and directors including the Individual Defendants.  These releases were the payoff that EIX required for the paltry exchange of an additional year of payments under the Tax Sharing Agreements.

### H.    The Creditors' Committee Seeks Standing to Sue EIX and the Individual Defendants Due to Their Role in Defrauding EME and its Creditors

97.    In connection with EME's bankruptcy proceeding, on January 31, 2013, the bankruptcy court entered an order authorizing the EME debtors and the Creditors' Committee to conduct an examination of EIX and certain related parties pursuant to Rule 2004 of the Bankruptcy Rules (the "2004 Order"). The objective of the 2004 Order was to permit the debtors of EME to

investigate potential claims and causes of action against EIX that would be released by the proposed settlement set forth in the Transaction Support Agreement.

98.     Under the 2004 Order, the Creditors' Committee had reviewed more than 147,000 documents, roughly 1 million pages, produced by EIX and analyzed certain transactions and other related matters.  The Creditors' Committee has also received another 5,860 documents produced by the EME debtors.

99.     On July 31, 2013, the Creditors' Committee filed a motion requesting the right to sue EIX claiming it improperly drained EME of billions of dollars, as described herein. Specifically, the Creditors' Committee sought bankruptcy-court approval to pursue legal claims related to the "abusive domination and control" of EME by EIX.  As a result of its examination of EIX, the Creditors' Committee stated that it had already uncovered facts supporting numerous valuable claims against EIX, various EIX subsidiaries and certain current and former directors of EME and EIX including the Individual Defendants. These claims included, among other things, fraud, negligent misrepresentation, breach of fiduciary duty and unjust enrichment.

100.     In connection with their motion, the Creditors' Committee filed a proposed complaint with the bankruptcy court naming each of the Individual Defendants as defendants, alleging that EIX defrauded EME by effectuating fraudulent transfers of EME's assets to EIX via the Dividends and the Tax Sharing Payment and seeking the repayments of claims that the Creditor Committee stated were worth billions of dollars plus compensatory and punitive damages.

101.     Even though EME also indicated to the bankruptcy court that it had also been preparing to make similar allegations against EIX, the Creditors Committee requested the bankruptcy court to let it sue on behalf of EME, stating EME has "numerous" conflicts of interest to pursue legal action against EIX including the fact that EME's Board was controlled by EIX at all times during the improper transactions complained of.

102.     The Creditors Committee also urged the bankruptcy court to force EIX to cooperate with its investigation into legal claims against EIX, arguing that EIX's refusal to do so had "severely prejudiced" their efforts. In court papers, the Creditors Committee alleged, among other

1    things, that "EIX has improperly refused to produce thousands of documents...and has instructed

2    its employees not to answer certain questions in depositions related to EME."

3        103.    Unsurprisingly, once the extent of EIX and the Individual Defendants' misconduct

4    was revealed from the Creditors' Committee's investigation, on July 25, 2013 the Ad Hoc Group

5    provided notice to EIX that it was terminating the Transaction Support Agreement. Moreover, the

6    Ad Hoc Group supports the Creditor's Committee motion to pursue claims against EIX.  As noted

7    above, this is significant for two reasons: (1) the Ad Hoc Group holds in the aggregate the vast

8    majority of EME's unsecured debt; and (2) the vast majority of the Ad Hoc Group's debt is made

9    up of senior noteholders who came into being because of the Individual Defendants' scheme to

10   have EME pay off MEHC's debt.

11

12   **I.    EIX Enters Into a Settlement Agreement with EIX and EIX's Creditors to the Tune of $634 Million**

13       104.    Faced with the writing on the wall, the Individual Defendants had no other recourse

14   but to settle the Creditors' Committee's and EME's proposed claims against EIX. On February 18,

15   2014, the Settlement Agreement was reached between EIX, EME and a majority of EME's

16   creditors. The Settlement Agreement resolves all claims between EME and EIX related to the

17   EME bankruptcy and requires bankruptcy court approval. The Settlement Agreement will be

18   incorporated into EME's Plan of Reorganization.

19       105.    Under the EME's proposed Chapter 11 Plan of Organization, EIX loses EME's

20   assets as substantially all of EME's assets are to be sold to NRG Energy for a purchase price of

21   $2.64 billion. Therefore, as a result of the Individual Defendants' misconduct in forcing EME to

22   incur MEHC's debt and the subsequent bankruptcy and deconsolidation of EME, EIX loses EME's

23   assets, and in fact, losses them at a reduced purchase price.   According to analyst Travis Miller,

24   for Morningstar Inc., when discussing NRG's purchases price for EME's assets, "We think that

25   NRG can integrate these units and they didn't pay very much from them."

26

27

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

106.   Under the Settlement Agreement, EME, which will be free and clear of liabilities once the EME reorganization is completed, will continue to be an indirect wholly owned subsidiary of EIX and EIX will consolidate EME for income tax purposes.

107.   Subsequent to the sale of EME's assets and the discharge of its liabilities, EME is currently expected to have an estimated $1.2 billion of unused tax attributes, mainly net operating losses.  Upon the approval of the Plan of Reorganization, all assets and liabilities of EME that are not otherwise discharged in the bankruptcy or transferred to a subsidiary of NRG Energy will be transferred to a newly formed trust or other entity under the control of EME's existing creditors (the "Reorganization Trust").

108.   Pursuant to the Settlement Agreement, EIX will pay EME creditors 50% of the amount of unused tax attributes plus interest for deferred payments, thus EIX is required to essentially share the value of these tax attributes on a 50/50 basis with EME's creditors. Specifically, EIX has two sets of obligations under the Settlement Agreement.

109.   First, when EME's Plan of Reorganization is completed, EIX will make a payment of $225 million and issue two coupon notes to the Reorganization Trust.  The notes of $199 million and $210 million will have payment dates of September 30, 2015 and September 30, 2016, respectively, and these notes include 5% interest on the remaining amounts.  Accordingly, the total amount of notes that EIX has to pay to the Reorganization Trust is a staggering ***$634 million.***

110.   The $634 million payment is a direct result of the Individual Defendants' breaches of fiduciary duty. Pursuant to the Tax Sharing Agreements, and prior to any wrongdoing by the Individual Defendants, EIX always had the authority to utilize tax losses and credits generated by EME and EME was required to make tax-allocation payments to EIX for EIX's sole benefit. Therefore, EIX always had rights to the full $1.2 billion of EME's tax benefits.

111.   As a consequence of unlawfully depleting EME by the Dividends and the Tax Sharing Payment, EIX had no choice but to agree to the Settlement Agreement, which now mandates EIX to share EME's $1.2 billion tax benefits on a 50/50 basis with the Reorganization Trust resulting in a payment of $634 million to EME's creditors.

112.    The second obligation under the Settlement Agreement is that EIX will retain liabilities for certain retirement benefits and for federal and state income taxes. The total of these assumed liabilities, which EIX was previously obligated, is approximately $350 million.

113.    But most importantly to the Individual Defendants, it gets them back the release from liability they so desperately wanted when they had the EIX companies enter into the Transaction Support Agreement, only this time it cost EIX $634 million.

## VI.        THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY

114.    In breach of their fiduciary duties of loyalty and good faith, defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, White, Adler, Clarke, Scilacci and Valdman   knowing caused EIX to unlawfully deplete EME as described herein.

115.    Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, White, Adler, Clarke, Scilacci and Valdman  knew that:

a)   EME received nothing of value in exchange for the Dividends and the Tax Sharing Payments;

a)   The sole purpose of the Dividends and the Tax Sharing Payment was to funnel cash to EIX at the expense of EIX and its creditors;

b)   At the time of the Tax Sharing Payment, EME's financial situation was hopeless and thus the objective of the Tax Sharing Payment was to strip EME of all valuable assets before EME filed for bankruptcy; and

c)   The timing of EME's bankruptcy had to be manipulated so that EIX could terminate the valuable Tax Sharing Agreements before EME filed for bankruptcy.

116.    Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, White, Adler, Clarke, Scilacci and Valdman's decision to cause EIX to unlawfully deplete EME by the Dividends and the Tax Sharing Payment, was not, and could not possibly have been, the product of a good faith exercise of business judgment.

117.     As a direct and proximate cause of Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, White, Adler, Clarke, Scilacci and Valdman's breaches of fiduciary duties, EIX has sustained damages, including but not limited to, the loss of EME's assets and/or the loss of EME's assets at a discounted purchase price, the costs and expenses incurred as a result of the litigation against EIX and the payment of $634 million to EME's creditors.

**VII.     DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

118.     Plaintiff brings this action derivatively in the right and for the benefit of EIX to redress breaches of fiduciary duties.

119.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

120.     As a result of the facts set forth herein, Plaintiff has not made any demand on the EIX Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

121.     At the time this action was commenced, the Board consisted of twelve directors: non-defendant Ellen O. Tauscher and defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White.

122.     A majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the following reasons:

> a.     Defendants Cordova, Freeman, Olson, Sutton, Nogales and Schlosberg as EIX directors and Craver as an EME director are substantially likely to be held liable for breaching their fiduciary duties by defrauding EME and its creditors, including but not limited to causing EME to pay the Dividends as complained of herein;
>
> b.     Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White are substantially

likely to be held liable for breaching their fiduciary duties by defrauding EME and its creditors, by including but not limited to causing EME to make the Tax Sharing Payment as complained of herein;

c.      Defendants Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White face additional substantial likelihood of liability as they were named defendants in the proposed action the Creditors Committee sought to bring on behalf of EME in EME's bankruptcy proceeding which EIX was forced to settle for, among other things, a payment of $634 million. Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White are unable to pursue derivative claims because they would be substantiating their culpability in connection with the Creditors Committee's proposed action and subsequent settlement against them and therefore Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White are conflicted from investigating the Company's misconduct and cannot independently consider a demand;

d.      Defendants Bindra, Cordova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White face additional substantial likelihood of liability because they were SCE directors at the time of the Tax Sharing Payment, and used their position to benefit SCE, and accordingly EIX, to the detriment of EME. In causing SCE to receive the improper Tax Sharing Payment, they consciously disregarded their responsibilities to SCE and abdicated their duties as SCE directors and therefore Bindra, Cordova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg and White are conflicted from investigating the misconduct alleged herein and cannot independently consider a demand;

e.      Defendant Craver's principal professional occupation is his position as EIX's Chairman, President and CEO.  In his position as Chairman, President and CEO which the Company recognizes makes him non-independent, Craver stands to earn millions of dollars in annual salary, bonuses, and other compensation, all of which must be approved by the Company's current Compensation Committee comprised of defendants Chang, Nogales, Taylor and White and therefore Craver lacks independence from these directors; and

f.      Defendant Olson is a partner of the law firm of Munger, Tolles & Olson LLP, which provides legal services to the EIX companies. The fees paid to Munger, Tolles & Olson LLP for legal services

31

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

amounts to millions of dollars a year.  The Company admits in its proxy filing that the legal services are expected to continue in the future, and therefore Olson lacks independence from the other directors of EIX.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

123.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

124.   As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia,* exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

125.   As alleged herein, the Individual Defendants knowingly implemented and engaged in the Company's illegal conduct of unlawfully depleting EME by the Dividends and the Tax Sharing Payment, breaching their fiduciary duties of loyalty and good faith.

126.   As a result of the Individual Defendants' breaches of fiduciary duties, EIX has sustained damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   Dated:  March 7, 2014                    **FARUQI & FARUQI, LLP**

2

3

4                                           David E. Bower (119546)
                                            10866 Wilshire Boulevard, Suite 1470
5                                           Los Angeles, CA 90024
                                            Telephone: (424) 256-2884
6                                           Facsimile: (424) 256-2885
                                            Email: dbower@faruqilaw.com
7

8                                           *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                            33
      VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, NATALIE GORDON, hereby verify that I have authorized the filing of the attached Verified Amended Shareholder Derivative Complaint, that I have reviewed the Verified Amended Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: March 7, 2014

_____
NATALIE GORDON

# EXHIBIT A



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, February 25, 2010, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

Present:     Chairman Craver,[2] Directors Chang, Córdova, Curtis, Fohrer,[3,4]
             Freeman, Nogales, Olson, Rosser, Schlosberg, Sutton, and White

Absent:      None

Edison International ("EIX") Executive Vice President and General Counsel Adler,[4] Executive Vice President Gault,[5] Executive Vice President, Chief Financial Officer and Treasurer Scilacci,[4] and Senior Vice President Parsky;[5] Southern California Edison Company ("SCE") President Fielder,[4] Senior Vice President and General Counsel Pickett,[4] and Senior Vice President and Chief Nuclear Officer Ridenoure;[6] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[7] Edison Mission Group Inc. ("EMG") Chairman, President and Chief Executive Officer Litzinger;[4] and Special Advisor Sheppard[8] met with the Board.

Written materials were provided to the Board in advance of the meeting and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

[4]   Not present for any of the Executive Sessions.

Redacted: Non-EME Information

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**FINANCIAL UPDATE**

Redacted: Non-EME Information

Mr. Scilacci reviewed the 2009 goals performance for EIX, SCE and EMG in each goal category, noting the key factors affecting the results. He responded to questions from the Board regarding the organization of the internal risk management function.

**2010 GOALS UPDATE AND RESOLUTIONS RE: 2010 GOALS**

Redacted: Non-EME Information

Redacted: Non-EME Information Mr. Scilacci next discussed the EMG EBITDA and security goals.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

2

EIX000258

**Redacted: Non-EME Information**

## EMG REPORT

Mr. Litzinger reported on EMG's plan to proceed with selective non-catalytic reduction ("SNCR") systems to achieve compliance with the Illinois Combined Pollutant Standard for nitrogen oxide emissions. He responded to questions from the EIX Board. The EIX Board and management discussed key risks in the SNCR approach and reasons for choosing this approach.

Mr. Litzinger presented an update on the Mitsubishi wind turbine issues and the impact on EMG. He responded to questions from the EIX Board. Mr. Litzinger then reported on the status of the Laredo Ridge Wind Project and progress on placement of wind turbines.

Mr. Litzinger reported on recent EMG management changes, including replacement of Edison Mission Marketing & Trading, Inc. ("EMMT") leadership and changes in project development leadership.

## SCE REPORT

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

3

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

4

EIX000260

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL                                                                                    EIX000261



Redacted: Non-EME Information

Mr. Schlosberg reported on the Compensation and Executive Personnel Committee meeting held on February 24, 2010.  He reported that the Committee: Redacted: Non-EME Information Redacted: Non-EME Information b) established the 2009 annual incentive award pools for EIX, EMG and SCE, as applicable; c) approved 2009 annual incentive awards, 2010 salaries and 2010 long-term incentive awards for EIX, EMG and SCE officers, as applicable, Redacted: Non-EME Information Redacted: Non-EME Information Redacted: Non-EME Information d) adopted the 2010 Executive Incentive Plan goals for EIX, EMG and SCE officers, as applicable, noting that these are the same as the 2010 corporate goals approved by the Board; Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL                                                                                    EIX000262

**Redacted: Non-EME Information**

**Redacted: Non-EME Information**

**Redacted: Non-EME Information**

**Redacted: Non-EME Information**

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
Chairman of the Board,
Southern California Edison Company

_____
Lead Director
(Non-Management Executive Session only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

7

CONFIDENTIAL                                                       EIX000263

# EXHIBIT B



### MINUTES OF JOINT REGULAR MEETING OF
### THE BOARDS OF DIRECTORS OF
### EDISON INTERNATIONAL AND
### <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, February 23, 2012, at the principal office located at
2244 Walnut Grove Avenue, Rosemead, California.

Present:     Chairman Craver,[2] Directors Bindra, Chang, Córdova, Curtis, Freeman,
             Litzinger,[3,4] Nogales, Olson, Rosser, Schlosberg, Sutton, Taylor and
             White

Absent:      None

Edison International ("EIX") Executive Vice President and General Counsel Adler,[4] Executive Vice President, Chief Financial Officer and Treasurer Scilacci[4] and Senior Vice President David;[5] Southern California Edison Company ("SCE") Senior Vice President and Chief Nuclear Officer Dietrich;[6] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] Edison Mission Group Inc. ("EMG") President Pizarro;[4,7] and Special Advisor Sheppard[6] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

[4]   Present only for the Regular Session.

Redacted: Non-EME Information

[7]   Not present for the Operational Excellence discussion of SCE's December windstorm response and left the meeting after the EMG Report.

EIX000003

**REGULAR SESSION**

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**OPERATIONAL EXCELLENCE**

Mr. Pizarro discussed the Operational Excellence Management Model included in the materials previously provided to the Board. Management responded to questions from the EIX Board. Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**EMG REPORT**

Mr. Pizarro reported that Edison Mission Energy signed a memorandum of understanding with the City of Chicago. He discussed natural gas prices and corporate liquidity, the near-term implications, and potential self-help options. The EIX Board and management discussed the impact of low natural gas prices and potential EMG discussions with bondholders. The EIX Board commended EMG management's work in addressing the issues.

Redacted: Non-EME Information

Redacted: Non-EME Information

2

CONFIDENTIAL

EIX000004

SONGS REPORT

**Redacted: Privilege**

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

3

CONFIDENTIAL

EIX000005

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

4

EIX000006

Redacted: Non-EME Information

# Redacted: Non-EME Information

## Redacted: Non-EME Information

# Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

**SECOND EXECUTIVE SESSION**

**COMPENSATION AND EXECUTIVE PERSONNEL COMMITTEE REPORT**

    Mr. Schlosberg further reported on the Compensation and Executive Personnel Committee meeting held on February 22, 2012. Referring to materials provided to the Board at the meeting, he described the process undertaken to determine and approve 2011 annual incentive awards, 2012 salaries and 2012 long-term incentive awards for EIX, EMG and SCE officers, as applicable.

5

CONFIDENTIAL

**Redacted: Non-EME Information**

**Redacted: Non-EME Information**

**ADJOURNMENT**

      There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Lead Director (Non-Management Executive Session only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

6

EIX000008

# EXHIBIT C



MINUTES OF JOINT REGULAR MEETING OF
THE BOARDS OF DIRECTORS OF
EDISON INTERNATIONAL AND
<u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, February 24, 2011, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

Present:    Chairman Craver,[2] Directors Bindra, Chang,[3] Córdova, Curtis, Freeman, Litzinger,[4,5] Nogales, Olson, Rosser, Schlosberg, Sutton and White[6]

Absent:    None

Edison International ("EIX") Executive Vice President and General Counsel Adler,[5] Chief Financial Officer and Treasurer Scilacci[7] and Senior Vice President David;[8] Southern California Edison Company ("SCE") Executive Vice President and General Counsel Pickett[7] and Senior Vice President and Chief Nuclear Officer Dietrich;[9] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[7] Edison Mission Group Inc. ("EMG") President Pizarro;[7] and Special Advisor Sheppard[9] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

[7]   Present only for the Regular Session.

Redacted: Non-EME Information

CONFIDENTIAL

EIX000009

**EXECUTIVE SESSION**

# Redacted: Privilege

**NON-MANAGEMENT EXECUTIVE SESSION**

# Redacted: Privilege



Mr. Scilacci presented the other 2011 goals.  He discussed the items that changed from the preliminary goals presented in December 2010, Redacted: Non-EME Information the EMG EBITDA goal, Redacted: Non-EME Information Mr. Scilacci noted that EMG's equivalent unplanned outage rate ("EUOR") goal was not changed after the Homer City outage. Redacted: Non-EME Information

2

EIX000010

Redacted: Non-EME Information

**EMG REPORT**

      Mr. Pizarro discussed the recent Homer City accident and resulting outage, and actions being taken in response to the event.  He reviewed the dashboards previously provided to the EIX Board regarding the Illinois coal fleet, Homer City plant, and wind and gas fleet, highlighting recent developments.  Mr. Pizarro responded to questions from the EIX Board.

**SCE REPORT**

Redacted: Non-EME Information

3

CONFIDENTIAL



**FINANCE COMMITTEE REPORT**

Mr. Nogales reported on the Finance Committee meeting held on February 23, 2011. He reported that the Committee received:

4

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information and c) updates to the SCE and EME 2011 financing plans.

Redacted: Non-EME Information

Redacted: Non-EME Information

5

EIX000013



CONFIDENTIAL

EIX000014

## EXECUTIVE SESSION

## COMPENSATION AND EXECUTIVE PERSONNEL COMMITTEE REPORT

Mr. Schlosberg further reported on the Compensation and Executive Personnel Committee meeting held on February 23, 2011.  He reported that the Committee approved 2010 annual incentive awards, 2011 salaries and 2011 long-term incentive awards for EIX, EMG and SCE officers, as applicable.

Redacted: Non-EME Information

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Lead Director,
(Non-Management Executive Session only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

7

CONFIDENTIAL

EIX000015

# EXHIBIT D



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## SOUTHERN CALIFORNIA EDISON COMPANY[1]

Held on Thursday, April 22, 2010, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

Present:     Chairman Craver,[2] Directors Bindra, Chang,[3] Córdova, Curtis, Fohrer,[4,5] Freeman,[2] Nogales, Rosser, Schlosberg, Sutton, and White

Absent:      Olson

Edison International ("EIX") Executive Vice President and General Counsel Adler,[5] Executive Vice President Gault,[6] and Executive Vice President, Chief Financial Officer and Treasurer Scilacci;[5] Southern California Edison Company ("SCE") President Fielder,[5] Senior Vice President House,[7] Senior Vice President and Chief Nuclear Officer Ridenoure,[8] and Vice President Vasquez;[6] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[5] Edison Mission Group Inc. ("EMG") Chairman, President and Chief Executive Officer Litzinger;[5] and Special Advisor Sheppard[9] met with the Board.

Written materials were provided to the Board in advance of the meeting and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

[5]   Not present for the Executive Session or the Independent Director Executive Session.

Redacted: Non-EME Information

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

## EMG REPORT

Mr. Litzinger discussed the 2010 EMG earnings forecast by business line.  The EIX Board and management discussed factors affecting the forecast.  Mr. Litzinger described the impact of hedging activities on 2010 first quarter earnings and the earnings outlook.  He responded to questions from the EIX Board.  Mr. Litzinger described the impact of liquidity on hedging activities.  In response to a question from the EIX Board, Mr. Litzinger discussed the potential impact of pending legislation regarding derivatives.  The EIX Board and management discussed hedging strategy.

Mr. Liztinger then discussed EMG wind fleet issues and first quarter trading results.

## EMG STRATEGY

Mr. Craver introduced the EMG strategy discussion and explained the purpose of Mr. Litzinger's presentation.  Mr. Litzinger discussed the Illinois environmental compliance agreement requirements and timeline, the objectives of EMG's environmental compliance strategy, the scenarios for compliance analyzed by management, and key takeaways from the analysis.  The EIX Board and management discussed the factors considered in the analysis and the impact of the various options on EMG's business.  Mr. Litzinger discussed management's plans to seek regulatory acceptance of Trona technology, the financial impact of using Trona technology, and the key decision timeline.

Mr. Litzinger discussed Homer City environmental compliance issues, including technology options, regulatory uncertainty, and liquidity considerations.  He reviewed alternatives under consideration, and responded to questions from the EIX Board.  The EIX Board and management discussed industry trends in addressing environmental compliance.  Mr. Litzinger explained key risks and sensitivities considered in the analysis of alternatives, financial incentives for early retirement of the coal fleet, and the next steps.  Mr. Craver commented on the significant management attention to this issue.

2

EIX000265

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

3

EIX000266

Redacted: Non-EME Information

Redacted: Non-EME Information

**FINANCE COMMITTEE REPORT**

   Mr. Nogales reported on the Finance Committee meeting held on April 21, 2010.
He reported that:  a) the EIX Committee reviewed EMG's Laredo Ridge wind project, noting
management's view that building the project was the highest value alternative and that EMG will
spend less capital in 2010 than approved by the EIX Board; Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

EIX000267

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL   EIX000268

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**ADJOURNMENT**

There being no further business, the meeting was adjourned.

Chairman of the Board,
Edison International

Chairman of the Board,
Southern California Edison Company

Lead Director
(Independent Director Executive Session only)

Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

6

CONFIDENTIAL

EIX000269

# EXHIBIT E



**MINUTES OF JOINT REGULAR MEETING OF
THE BOARDS OF DIRECTORS OF
EDISON INTERNATIONAL AND
SOUTHERN CALIFORNIA EDISON COMPANY**[1]

Held on Thursday, December 9, 2010, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

|  |  |
|---|---|
| Present: | Chairman Craver,[2] Directors Bindra, Chang, Curtis, Fohrer,[3,4] Freeman, Nogales, Olson, Rosser, Schlosberg, Sutton, and White |
| Absent: | Córdova |

Edison International ("EIX") Executive Vice President and General Counsel Adler,[4] Executive Vice President Gault,[5] and Executive Vice President, Chief Financial Officer and Treasurer Scilacci;[4] Southern California Edison Company ("SCE") President Fielder,[4] Senior Vice President and Chief Nuclear Officer Dietrich,[6] Senior Vice President House,[7] Senior Vice President and General Counsel Pickett,[4] Senior Vice President Sheppard,[6] and Vice President Vasquez;[5] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] and Edison Mission Group Inc. ("EMG") Chairman, President and Chief Executive Officer Litzinger[4] and Senior Vice President McFarlan[5] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

**EIX EXECUTIVE SESSION**

The EIX Board discussed proposed SCE and EMG management changes.

Redacted: Non-EME Information

[4]   Not present for the EIX Executive Session or Non-Management Executive Session.

Redacted: Non-EME Information

**REGULAR SESSION**

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Mr. Scilacci reviewed the strategic growth plan goals for SCE and EMG.  Management responded to questions from the Board.  T Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

2

EIX000245

Redacted: Non-EME Information Mr. Scilacci presented Edison Mission Energy's ("EME") 2011 capital budget request and five-year capital forecast.

After discussion, on motion duly made, seconded and unanimously carried, the 2011 SCE and EME capital budgets were approved by the SCE and EIX Boards, respectively.

Redacted: Non-EME Information

Redacted: Non-EME Information

## EMG REPORT

Mr. Craver introduced the EMG report, noting that it would include the semi-annual fundamental forecast update. Mr. Litzinger reviewed EMG's coal fleet dashboard, calling attention to EMG's receipt of the Waukegan 7 plant permit from the Illinois Environmental Protection Agency. He reviewed the status of factors affecting EME's coal fleet retrofits. Mr. Litzinger reviewed the Homer City plant and wind and gas fleet dashboards, the status of emission credit issues, and energy price forward curves. The EIX Board and management discussed factors affecting energy prices. Mr. Litzinger presented EMG's fundamental forecast update, reviewing key changes and assumptions affecting the forecast. The EIX Board and management discussed the forecast and the impact of alternative actions. Management responded to questions from the EIX Board.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

3

EIX000246

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

4

CONFIDENTIAL

EIX000247

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL

EIX000249

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

**ADJOURNMENT**

     There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
Chairman of the Board,
Southern California Edison Company

_____
Lead Director
(Non-Management Executive Session only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

7

CONFIDENTIAL

EIX000250

# EXHIBIT F



**MINUTES OF JOINT REGULAR MEETING OF
THE BOARDS OF DIRECTORS OF
EDISON INTERNATIONAL AND
SOUTHERN CALIFORNIA EDISON COMPANY**[1]

Held on Thursday, December 8, 2011, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

| | |
|---|---|
| Present: | Chairman Craver,[2] Directors Bindra, Chang, Córdova, Curtis, Freeman, Litzinger,[2,3] Nogales, Olson, Rosser, Schlosberg, and White |
| Absent: | Sutton |

Edison International ("EIX") Executive Vice President and General Counsel Adler,[2] Executive Vice President, Chief Financial Officer and Treasurer Scilacci[4] and Senior Vice President David;[5] Southern California Edison Company ("SCE") Senior Vice President and Chief Nuclear Officer Dietrich;[6] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] Edison Mission Group Inc. ("EMG") President Pizarro;[4,7] and Special Advisor Sheppard[6] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

[7]   Not present for the Financial Update and 2012 Earnings Per Share ("EPS") Budget, 2012 Capital Budget and Five-Year Capital Plan, SCE Report, SONGS Report or Finance Committee Report.

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**2012 CAPITAL BUDGET AND FIVE-YEAR CAPITAL PLAN**

Redacted: Non-EME Information

Mr. Scilacci presented the Edison Mission Energy ("EME") 2012 capital budget and five-year capital plan, and responded to questions from the EIX Board.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**2012 GOALS**

Redacted: Non-EME Information

2

**Redacted: Non-EME Information**

Redacted: Non-EME Information Mr. Pizarro discussed EMG operational excellence goals. Mr. David explained the people and culture goals.

**EMG REPORT**

Mr. Pizarro called the EIX Board's attention to the report included in materials previously provided to the Board, and reported on a reduction in force at EMG.

**SCE REPORT**

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

3

CONFIDENTIAL

EIX000272



**FINANCE COMMITTEE REPORT; RESOLUTIONS RE: AMENDMENT OF FINANCE COMMITTEE CHARTER; AND SCE RESOLUTION RE: FINANCING AUTHORIZATION**

Mr. Freeman reported on the EIX Finance Committee meeting held on October 26, 2011 and the Committee meeting held on December 7, 2011. He reported that, on October 26, the EIX Committee increased EME's 2011 capital budget for gas-fired projects and contracted wind projects, and on December 7, the Committee: Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information b) reviewed the applicable EME and SCE 2012 financing plans, and the SCE Committee recommended that the SCE Board authorize an additional $750 million of SCE debt and preferred financings; c) Redacted: Non-EME Information

Redacted: Non-EME Information

4

CONFIDENTIAL

EIX000273

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information



Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL

EIX000274

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

## ADJOURNMENT

There being no further business, the meeting was adjourned.

Chairman of the Board,
Edison International

President,
Southern California Edison Company

Lead Director (Non-Management Executive Session only)

Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

6

CONFIDENTIAL                                                                  EIX000275

# EXHIBIT G



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, September 6, 2012, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

Present:       Chairman Craver,[2] Directors Bindra, Chang, Córdova, Curtis, Freeman, Litzinger,[3,4] Nogales, Olson,[5] Schlosberg, Sutton, Taylor and White

Absent:       None

Edison International ("EIX") Executive Vice President and General Counsel Adler[4] and Executive Vice President, Chief Financial Officer and Treasurer Scilacci;[4] Southern California Edison Company ("SCE") Senior Vice President Dietrich;[6] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] Edison Mission Energy ("EME") President Pizarro;[7] Special Advisor Sheppard;[8] and SONGS consultants Alex Zarechnak[9] and Ellis Merschoff[9] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

[7]   Not present for the EME Restructuring Report, the Non-Management Executive Session, the SONGS Report, the SONGS Strategy discussion, or the Independent Director Executive Session.

Redacted: Non-EME Information

CONFIDENTIAL

EIX000183



Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL

EIX000184

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

### EME RESTRUCTURING REPORT

Under attorney-client privilege, Mr. Adler reported on the EME restructuring process, discussions with EME bondholders' advisors, and factors affecting EIX's position in negotiations with the advisors. He reported that Powerton/Joliet bondholders are organizing. Mr. Adler responded to questions from the EIX Board. Mr. Craver commented on EIX's position in negotiations with EME bondholders' advisors.

### OPERATIONAL AND SERVICE EXCELLENCE

Redacted: Non-EME Information

Calling the Board's attention to materials provided in advance of the meeting, Mr. Pizarro reported on EME operational excellence, discussed key metrics and performance, and responded to questions from the EIX Board.

3

EIX000185

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Mr. Freeman reported on the Finance Committee meeting held on September 6, 2012. He reported that: Redacted: Non-EME Information Redacted: Non-EME Information ) the EIX Committee received updates on EME's liquidity and business conditions; Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

4

EIX000186





5

CONFIDENTIAL

EIX000187

**Redacted: Non-EME Information**

**Redacted: Non-EME Information**

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Lead Director (Non-Management and Independent
Director Executive Sessions only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

6

CONFIDENTIAL

EIX000188

# EXHIBIT H



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, June 23, 2011, at the Bel-Air Bay Club located at 16801 Pacific Coast Highway, Pacific Palisades, California.

Present:     Chairman Craver, Directors Bindra, Chang, Córdova, Curtis, Freeman, Litzinger,[2] Nogales, Schlosberg, Sutton and White[3]

Absent:      Olson and Rosser

Edison International ("EIX") Executive Vice President and General Counsel Adler, Executive Vice President, Chief Financial Officer and Treasurer Scilacci and Senior Vice President Valdman; EIX and Southern California Edison Company ("SCE") Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] and Edison Mission Group Inc. ("EMG") President Pizarro[5] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

# Redacted: Non-EME Information

[5]     Not present for the SCE discussion during the Strategy Session.

CONFIDENTIAL

EIX000165

**Redacted: Non-EME Information**

**COMPENSATION AND EXECUTIVE PERSONNEL COMMITTEE REPORT**
**AND RESOLUTIONS RE:  DIRECTOR COMPENSATION**

**Redacted: Non-EME Information**

**Redacted: Non-EME Information**

Mr. Schlosberg reported that the EIX Committee approved management's recommendation regarding the allocation of responsibility for payment of Mr. Pizarro's executive benefits, and the Committee reviewed an analysis of the 2011 shareholder advisory vote on executive compensation.

Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information Mr. Pizarro described EMG's strategies.  Mr. Valdman reviewed strategies for growth and diversification.  The Board and management engaged in a discussion of EIX, SCE and

2

EIX000166

EMG risks and strategies.

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

CONFIDENTIAL

EIX000167

# EXHIBIT I



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, September 2, 2010, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

|  |  |
|---|---|
| Present: | Chairman Craver,[2] Directors Bindra, Chang, Córdova, Curtis, Fohrer,[3,4] Freeman, Nogales, Olson, Rosser, Schlosberg, Sutton, and White[5] |
| Absent: | None |

Edison International ("EIX") Executive Vice President and General Counsel Adler,[6] Executive Vice President, Chief Financial Officer and Treasurer Scilacci,[7] and Senior Vice President David;[8] Southern California Edison Company ("SCE") President Fielder,[7] Senior Vice President and General Counsel Pickett,[7] Senior Vice President and Chief Nuclear Officer Sheppard,[9] and Senior Vice President Yazdi;[10] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[7] and Edison Mission Group Inc. ("EMG") Chairman, President and Chief Executive Officer Litzinger[7] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

# Redacted: Non-EME Information

[7]   Not present for the Executive Session or the Non-Management Executive Session.

# Redacted: Non-EME Information

CONFIDENTIAL



Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

2

CONFIDENTIAL



Redacted: Non-EME Information



**EMG REPORT**

      Reviewing materials previously provided to the EIX Board, Mr. Litzinger reviewed the strategic alternatives discussed at the June Board meeting. He described the status of key factors affecting the preferred alternatives for the Illinois and Homer City coal fleets. He reviewed the wind fleet strategy and the status of factors affecting the strategy. He also reported on the status of the emission reduction credit issue for the

3

EIX000179

planned Walnut Creek gas plant.  He responded to questions from the EIX Board.

   Mr. Litzinger reviewed management's proposed approach for monitoring progress on the EMG strategy with the EIX Board.  He identified developments since the June Board meeting, and responded to questions from the EIX Board.  He explained plans in the event of an adverse outcome of pending tax issues.  Mr. Craver discussed factors affecting the need to refinance the revolving credit facility and investor perceptions.



4

EIX000180

Redacted: Non-EME Information

Mr. Nogales reported on the Finance Committee meeting held on September 1, 2010.  He reported that EMG management reported on:  a) investment criteria, goals and performance of the EMG wind portfolio; b) the San Juan Mesa and Goat Mountain projects and the performance of the projects relative to target; and c) the overall wind portfolio meeting its target rate of return. Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

# Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

5

EIX000181

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

### ADJOURNMENT

There being no further business, the meeting was adjourned.

Chairman of the Board,
Edison International

Chairman of the Board,
Southern California Edison Company

Lead Director
(Non-Management Executive Session only)

Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

6

EIX000182

# EXHIBIT J



**MINUTES OF JOINT REGULAR MEETING OF
THE BOARDS OF DIRECTORS OF
EDISON INTERNATIONAL AND
SOUTHERN CALIFORNIA EDISON COMPANY**[i]

Held on Thursday, June 21, 2012, at the Bel-Air Bay Club located at 16801 Pacific Coast Highway, Pacific Palisades, California.

Present:    Chairman Craver, Directors Bindra, Chang, Córdova,[2] Freeman, Litzinger,[3] Nogales, Olson,[2] Schlosberg, Sutton, Taylor and White

Absent:    Curtis

Edison International ("EIX") Executive Vice President and General Counsel Adler, Executive Vice President, Chief Financial Officer and Treasurer Scilacci and Senior Vice President Valdman; EIX and Southern California Edison Company ("SCE") Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] and Edison Mission Group Inc. ("EMG") President Pizarro[5] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

Referring to materials previously provided to the Board, they discussed new growth opportunities, EIX capital allocation, and under attorney-client privilege, EME strategy.

Redacted: Non-EME Information

---

[5]    Not present for the Strategy Session presentations regarding the San Onofre Nuclear Generating Station ("SONGS"), Edison Mission Energy ("EME") strategy and EIX capital allocation.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL                                                            EIX000038

Redacted: Non-EME Information

Redacted: Non-EME Information

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Lead Director (Non-Management Executive Session only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

3

CONFIDENTIAL                                                                    EIX000039

# EXHIBIT K



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, June 24, 2010, at the Bel-Air Bay Club located at 16801 Pacific Coast Highway, Pacific Palisades, California.

|         |         |
|---------|---------|
| Present: | Chairman Craver, Directors Bindra, Chang, Córdova, Curtis, Fohrer,[2,3] Freeman, Nogales, Olson, Rosser, Schlosberg, Sutton, and White |
| Absent: | None |

Edison International ("EIX") Executive Vice President and General Counsel Adler,[3] and Executive Vice President, Chief Financial Officer and Treasurer Scilacci;[3] EIX and Southern California Edison Company ("SCE") Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[4] and Edison Mission Group Inc. ("EMG") Chairman, President and Chief Executive Officer Litzinger[5] met with the Board.

Written materials were provided to the Board in advance of the meeting and reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

[5]   Not present for the First Executive Session or the discussion of SCE's 2012 General Rate Case held in the Second Executive Session.

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

2

EIX000169

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL                                                                                              EIX000170

**Redacted: Non-EME Information**

Reviewing materials previously provided to the Board, management and the Board engaged in an extensive review and discussion of SCE's 2012 General Rate Case, EMG's strategic alternatives, and EIX, SCE and EMG financial forecasts.

**ADJOURNMENT**

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
Chairman of the Board,
Southern California Edison Company

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

4

CONFIDENTIAL

EIX000171

# EXHIBIT L



## MINUTES OF JOINT SPECIAL MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Friday, March 18, 2011, at the principal office located at
2244 Walnut Grove Avenue, Rosemead, California.

| Present: | Chairman Craver, Directors Bindra,[2] Chang,[2] Córdova,[2] Curtis,[2] Freeman,[2] Litzinger,[3] Olson,[2] Rosser,[2] Schlosberg,[2] and White[2] |
|---|---|
| Absent: | Directors Nogales and Sutton |

Edison International ("EIX") Executive Vice President and General Counsel
Adler,[2] Executive Vice President Gault,[2] Executive Vice President, Chief Financial Officer
and Treasurer Scilacci,[2] Senior Vice President Valdman and Vice President Kracke; Southern
California Edison Company ("SCE") Senior Vice President and Chief Nuclear Officer
Dietrich;[2] EIX and SCE Vice President, Associate General Counsel, Chief Governance
Officer and Corporate Secretary Mathews; and Edison Mission Group Inc. ("EMG")
President Pizarro[2,4] met with the Board.

<u>SONGS REPORT</u>

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

[2]   Participated by conference telephone.  It was determined that all Directors could communicate with each other.

[4]   Present only for the EMG Report.

**Redacted: Non-EME Information**

### EMG REPORT

Mr. Pizarro reported on efforts to select a financial advisor to evaluate options for addressing Edison Mission Energy's debt maturities.  He reported on the receipt of unsolicited inquiries regarding asset purchases and management's evaluation of the inquiries.  The EIX Board and management discussed the parties making the inquiries and potential financial advisors.

Mr. Pizarro described a possible technical default on the Homer City lease, negotiations with the lessor and potential consequences.  He responded to questions from the EIX Board.

Mr. Pizarro reported on the Environmental Protection Agency's draft HAPs/MACT rule and recent court decision in the Midwest Generation LLC New Source Review litigation.

### ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

2

CONFIDENTIAL

EIX000021

# EXHIBIT M



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, April 26, 2012, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

Present:    Chairman Craver,[2] Directors Bindra, Chang, Córdova, Curtis, Freeman, Litzinger,[2,3] Nogales, Olson,[4] Schlosberg,[4] Sutton, Taylor and White

Absent:    None

Edison International ("EIX") Executive Vice President and General Counsel Adler,[2] Executive Vice President, Chief Financial Officer and Treasurer Scilacci[5] and Senior Vice President David;[6] Southern California Edison Company ("SCE") Senior Vice President and Chief Nuclear Officer Dietrich[7] and Vice President Miller;[6] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[5] Edison Mission Group Inc. ("EMG") President Pizarro;[8] Special Advisor Sheppard;[7] Incident Management Team Inc. ("IMT") Consultant Bolmer;[6] and Davies Consulting LLC ("Davies") Consultant Derie[9] met with the Board.

Written materials were provided to the Board in advance of the meeting and reviewed during the meeting.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

[8]   Not present for the Executive Session and left the meeting after the EMG Report.

Redacted: Non-EME Information

EIX000024

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

### EMG REPORT

Calling the EIX Board's attention to materials previously provided, Mr. Pizarro reported on the timing for the Fisk and Crawford plant shut-downs, and responded to questions from the EIX Board.

Mr. Pizarro provided an update on EMG liquidity and financing options, and responded to questions from the EIX Board. He reported on the external experts retained to provide advice on liquidity issues, tax issues affecting EMG liquidity, and potential restructuring options. Management responded to questions from the EIX Board.

Mr. Pizarro provided an update on Homer City. He discussed the implementation agreement between Homer City and General Electric Company, the status of discussions between General Electric and bondholders, and liquidity needs. He responded to questions from the EIX Board.

### SONGS REPORT



Redacted: Non-EME Information

CONFIDENTIAL

EIX000025

Redacted: Non-EME Information

# Redacted: Non-EME Information

**FINANCE COMMITTEE REPORT**

Mr. Freeman reported on the Finance Committee meeting held on April 25, 2012. He stated that management reported to the EIX and SCE Committees, as applicable, on:

Redacted: Non-EME Information

b) a decrease in planned capital spending at EMG;  Redacted: Non-EME Information

Redacted: Non-EME Information  and d) EMG's Capistrano wind capital raise transaction.  Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

Redacted: Non-EME Information

# Redacted: Non-EME Information

CONFIDENTIAL

EIX000026

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

4

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Nominating/Corporate Governance Committee Chair
(Independent Director Executive Session only)

_____
Lead Director (Non-Management Executive Session only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

5

EIX000028

# EXHIBIT N



# MINUTES OF JOINT SPECIAL MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## <u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Friday, May 25, 2012, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

| | |
|---|---|
| Present: | Chairman Craver,[2] Directors Bindra,[2] Chang, Córdova,[2] Freeman,[2] Litzinger,[3,4] Nogales,[2] Olson,[2] Schlosberg,[2] Taylor[2] and White[2] |
| Absent: | Curtis and Sutton |

Edison International ("EIX") Executive Vice President and General Counsel Adler and Executive Vice President, Chief Financial Officer and Treasurer Scilacci; Southern California Edison Company; ("SCE") Executive Vice President Pickett[2,4] and Senior Vice President and Chief Nuclear Officer Dietrich;[2,5] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews; and Special Advisor Sheppard[2,5] met with the Board.

Mr. Craver reviewed the meeting agenda.

Redacted: Non-EME Information

# Redacted: Non-EME Information

# Redacted: Non-EME Information

---

[4]   Left the meeting before the Edison Mission Group Inc. ("EMG") Update.

# Redacted: Non-EME Information

CONFIDENTIAL

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**EMG UPDATE**

     Mr. Adler provided an update on EMG, including the status of engagement with Edison Mission Energy bondholders. He noted that a further report would be provided to the EIX Board at the June meeting. Management responded to questions from the EIX Board.

**ADJOURNMENT**

     There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and Southern California Edison Company

2

EIX000036

# EXHIBIT O



## MINUTES OF JOINT REGULAR MEETING OF
## THE BOARDS OF DIRECTORS OF
## EDISON INTERNATIONAL AND
## SOUTHERN CALIFORNIA EDISON COMPANY[1]

Held on Thursday, October 25, 2012, at the principal office located at 2244 Walnut Grove Avenue, Rosemead, California.

Present:   Chairman Craver,[2] Directors Bindra, Chang, Córdova,[3] Curtis,[4] Freeman, Litzinger,[5,6] Nogales, Olson, Schlosberg, Sutton and White

Absent:   Director Taylor

Edison International ("EIX") Executive Vice President and General Counsel Adler,[6] Executive Vice President, Chief Financial Officer and Treasurer Scilacci,[6] Senior Vice President David,[7] Vice President Kracke[6,8] and Director Trapp;[9] Southern California Edison Company ("SCE") Senior Vice President Dietrich;[10] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[6] Edison Mission Energy ("EME") President Pizarro;[11] and Special Advisor Sheppard[10] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.

Redacted: Non-EME Information

[11]   Present only for the Risk Management Report and the Operational and Service Excellence Report.

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

## EME RESTRUCTURING REPORT

Under attorney-client privilege, Mr. Adler reported on EME restructuring discussions. Messrs. Adler and Craver responded to questions from the Board. Mr. Adler discussed governance changes likely to result from an EME bankruptcy filing. He also discussed personnel and tax impacts, and responded to additional questions from the Board.

CONFIDENTIAL

EIX000229

SONGS REPORT

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

3

CONFIDENTIAL

EIX000230

**Redacted: Non-EME Information**

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information Mr. Schlosberg reported that Mr. Craver discussed potential 2012 incentive compensation issues related to SONGS, EME and the GRC delay. He reported that the Committee reviewed its Charter and recommended no changes. Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

Redacted: Non-EME Information

**Redacted: Non-EME Information**

4

EIX000231



Redacted: Non-EME Information

Redacted: Non-EME Information

## ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Lead Director (Non-Management Executive Sessions only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

5

CONFIDENTIAL

# EXHIBIT P

**EDISON**
INTERNATIONAL®

MINUTES OF JOINT REGULAR MEETING OF
THE BOARDS OF DIRECTORS OF
EDISON INTERNATIONAL AND
<u>SOUTHERN CALIFORNIA EDISON COMPANY</u>[1]

Held on Thursday, December 13, 2012, at the principal office located at
2244 Walnut Grove Avenue, Rosemead, California.

Present:    Chairman Craver,[2] Directors Bindra, Chang, Córdova,[3,4] Curtis,[3] Freeman,[5] Litzinger,[2,6] Nogales, Olson, Schlosberg, Sutton, Taylor and White[7]

Absent:    None

Edison International ("EIX") Executive Vice President and General Counsel Adler,[2] Executive Vice President, Chief Financial Officer and Treasurer Scilacci,[2] Senior Vice President Clayton[8] and Senior Vice President Valdman;[9] Southern California Edison Company ("SCE") Senior Vice President Dietrich;[10] EIX and SCE Vice President, Associate General Counsel, Chief Governance Officer and Corporate Secretary Mathews;[2] and Special Advisor Sheppard[10] met with the Board.

Written materials were provided to the Board in advance of and at the meeting. These materials were reviewed during the meeting.



Redacted: Non-EME Information

CONFIDENTIAL

EIX000251

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

**EDISON MISSION ENERGY ("EME") RESTRUCTURING REPORT AND EIX RESOLUTION RE: EME BANKRUPTCY**

Under attorney-client privilege, Mr. Adler reported on EME's restructuring status. Redacted:Privileged

Redacted:Privileged

Redacted:Privileged Referring to written materials previously provided to the Board, he described the discussions with EME bondholders and responded to questions from the EIX Board.

Mr. Adler reviewed the material terms of a proposed equity turnover transaction with EME and certain of its bondholders. The EIX Board and management discussed the terms.

Redacted:Privileged

Mr. Craver compared the options previously described to the Board to the proposed transaction. He described his view of the merits of the proposed transaction and the outlook for EME, and responded to questions from the EIX Board. Mr. Adler responded to additional questions from the EIX Board.

Mr. Craver discussed the proposed process for final approval of the transaction agreement, and responded to questions from the EIX Board.

After further discussion, on motion duly made, seconded and carried, the resolution attached as Exhibit C was approved by the EIX Board.

2

CONFIDENTIAL

EIX000252

FINANCIAL UPDATE

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

3

EIX000253

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

CONFIDENTIAL

EIX000254

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

5

EIX000255

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

Redacted: Non-EME Information

### ADJOURNMENT

There being no further business, the meeting was adjourned.

_____
Chairman of the Board,
Edison International

_____
President,
Southern California Edison Company

_____
Lead Director (Non-Management Executive Sessions only)

_____
Vice President, Associate General Counsel,
Chief Governance Officer and Corporate Secretary,
Edison International and
Southern California Edison Company

6

CONFIDENTIAL

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have e-mailed the foregoing document to the non-CM/ECF participants indicated on the Manual Notice List.

Dated: March 7, 2014                              */s/ David E. Bower*
                                                  David E. Bower