O

# United States District Court
# Central District of California

| | |
|---|---|
| NATALIE GORDON,<br><br>        Plaintiff,<br><br>    v.<br><br>JAGJEET S. BINDRA; FRANCE A. CORDOVA; BRADFORD M. FREEMAN; RONALD L. OLSON; THOMAS C. SUTTON; PETER J. TAYLOR; VANESSA C.L. CHANG; THEODORE F. CRAVER, JR.; LUIS G. NOGALES; RICHARD T. SCHLOSBERG, III; BRETT WHITE; ROBERT L. ADLER; MARK CLARKE; WILLIAM J. SCILACCI; BERTRAND A. VALDMAN; EDISON INTERNATIONAL, nominal defendant,<br><br>        Defendants. | Case No. 2:14-cv-01058-ODW(ASx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND [12]** |

## I. INTRODUCTION

Plaintiff Natalie Gordon is a shareholder of Edison International ("EIX")—a holding company comprised of several wholly owned subsidiaries. She contends that

EIX caused Energy Mission Energy ("EME"), one such subsidiary, to pay $924 million in dividends and $183 million under a tax-sharing payment while insolvent—thus throttling EME into bankruptcy.

But this current Motion to Dismiss does not concern the merits of those decisions. Rather, to take the reins away from EIX's board via this derivative suit, Gordon bears the burden of establishing on a director-by-director basis that a majority of the board was either interested or not independent or that the challenged transactions were not the product of a valid exercise of business judgment. After considering Gordon's allegations and the parties' arguments, the Court concludes that Gordon has failed to satisfy this standard. She has not sufficiently alleged that EME was insolvent at the time of the dividends and tax-sharing payment sufficient to subject the Individual Defendants to a substantial likelihood of personal liability or to show that the payments constituted fraudulent transfers. The Court thus **GRANTS** Defendants' Motion to Dismiss **WITH LEAVE TO AMEND**.[1] (ECF No. 12.)

## II.  FACTUAL BACKGROUND

Gordon challenges EIX's board's decisions with respect to two transactions: (1) issuing $924 million in dividends, and (2) making a $183 million tax-sharing payment.

*1. Parties*

EIX is a California corporation, holding company, and 100-percent owner of Southern California Edison Company ("SCE") and Energy Mission Group ("EMG"). (Compl. ¶¶ 2, 45.) EMG in turn owns 100 percent of Mission Energy Holding Company ("MEHC"), which owns 100 percent of EME. (*Id.* ¶¶ 44–45.) EME is itself a holding company that is engaged in the business of developing, acquiring, owning or leasing, operating, and selling energy capacity from independent production facilities. (*Id.* ¶ 43.) EME is therefore an indirect, wholly owned subsidiary of EIX. (*Id.* ¶ 2.)

---

[1] After carefully considering the papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

Gordon is a New York citizen. (*Id.* ¶ 19.) She is an EIX shareholder and was an EIX shareholder at times relevant to this action. (*Id.*)

Defendants Jagjeet S. Bindra, France A. Córdvoa, Bradford M. Freeman, Ronald L. Olson, Thomas C. Sutton, Peter J. Taylor, Vanessa C. L. Chang, Luis G. Nogales, Richard T. Schlosberg, and Brett White are directors of both EIX and SCE. (*Id.* ¶¶ 21–27, 29–31.) Defendant Theodore F. Craver is EIX's Chief Executive Officer, President, and Chairman of the Board. (*Id.* ¶¶ 5, 28.) He is also an SCE director and has served as an EMG director and EIX officer. (*Id.* ¶ 28.)

Defendant Robert L. Adler is currently an Executive Vice President and General Counsel for EIX and previously was an EME director. (*Id.* ¶ 32.) Defendant Mark Clarke is an EIX Vice President and Controller who formerly worked for both EMG and EME. (*Id.* ¶ 33.) Defendant William J. Scilacci is EIX's Vice President, Chief Financial Officer, and Treasurer. (*Id.* ¶ 34.) Finally, Defendant Bertrand A. Valdman serves as EIX's Senior Vice President of Strategic Planning. (*Id.* ¶ 35.)

### 2. *EIX's relationship with EME*

Until 2012, the EME board consisted of three directors: EME's President and EIX's CFO and General Counsel. (*Id.* ¶ 47.) The EIX board approves executive compensation for EME officers, and EME represents itself as an EIX subsidiary. (*Id.* ¶¶ 49, 51.) EIX and its subsidiaries and affiliated companies (the "Consolidated Group") have also consolidated their financial statements for annual reporting purposes. (*Id.* ¶ 51.)

### 3. *EME pays a $924 million dividend to MEHC*

Gordon alleges that by the end of 2006, EME was in need of cash. (*Id.* ¶ 53.) EME reported on its 2006 Form 10-K that it had $7.25 billion in reported assets and $4.6 billion in reported liabilities but was also responsible for about $2.9 billion in additional expenditures for Midwest Generation, LLC—an EME subsidiary. (*Id.*) In its 2007 Form 10-K, EME reported $7.3 billion in assets and $5.3 billion in liabilities,
///

though it still was liable for the $2.9 billion in Midwest Generation expenditures. (*Id.* ¶ 55.)

In July 2001, MEHC issued $800 million of 13.50-percent, senior secured notes that were due in 2008. (*Id.* ¶ 56.) EME was not an obligor on these notes. (*Id.*) As the notes became due, Gordon alleges that EIX caused EME to pay MEHC dividends totaling $924 million: $25 million in January 2007 and $899 million in May 2007. (*Id.* ¶¶ 57–59.) To pay this sum, EME completed a private offering of $2.7 billion in senior notes with staggered due dates. (*Id.* ¶ 60.)

At the time, EIX's board consisted of Cordova, Freeman, Olson, Sutton, Nogales, Schlosberg, and Craver. (*Id.* ¶ 63.) Gordon contends that EIX was able to carry out the transaction because EME's board consisted of all EIX insiders: Craver, EIX's CEO; Thomas R. McDaniel, then EIX's CFO; and J.A. Bouknight, Jr., then EIX's General Counsel. (*Id.* ¶ 62.) She further asserts that the dividends were unfair to EME because it received no consideration from MECH in exchange, and EME had no obligation to pay MEHC's debts. (*Id.* ¶ 63.)

   4. *EME pays EIX a $183 million tax-sharing payment*

As part of its integrated financial reporting, the Consolidated Group filed a single federal income tax return as provided in their tax-sharing agreements. (*Id.* ¶ 74.) Under these agreements, the Consolidated Group would use one subsidiary's losses to offset another's gain, thus reducing the latter's tax liability. (*Id.*) In exchange for the tax offset, the subsidiary with the gain would make a payment to the subsidiary with the loss as a fee for the offset. (*Id.*)

By 2009, EME was producing net losses which the Consolidated Group used to offset gains by other EIX subsidiaries such as SCE. (*Id.* ¶ 78.) On September 27, 2012—despite EME's losses—EIX caused EME to pay EIX approximately $183 million as a tax-sharing payment. (*Id.* ¶ 79.) EIX then paid the money to SCE. (*Id.*)

Gordon alleges that there was no valid reason for EME to make this payment to EIX. (*Id.* ¶¶ 80, 84.) Rather, she contends that EIX used the guise of a tax-sharing

payment to drain EME of its assets before EME filed for bankruptcy. (*Id.* ¶ 80.) Since EME had over $120 million in senior notes set to mature at the end of 2012, it needed this money to pay those obligations. (*Id.* ¶ 84.) Gordon asserts that EIX's board was well aware of EME's financial situation at the time of the payment because it repeatedly discussed EME's financial plans and forecasts throughout the years leading up to the tax-sharing payment. (*Id.* ¶¶ 85–88.)

Subsequent to the tax-sharing payment, EIX's board sent EME a notice stating that it was terminating the tax-sharing agreements vis-à-vis EME as of December 31, 2012. (*Id.* ¶ 89.)

5.  *EME files for bankruptcy*

EIX could not make a $97.5 million interest payment due on November 15, 2012. (*Id.* ¶ 94.) After the 30-day grace period elapsed and EME was supposed to pay another $38.1 million interest payment, the company filed for bankruptcy on December 17, 2012. (*Id.*)

On January 31, 2013 the bankruptcy court empowered EME's Creditors' Committee to examine EIX and related parties under Federal Rule of Bankruptcy Procedure 2004. Six months later, the Creditors' Committee moved before the bankruptcy court for the right to sue EIX, claiming that it had improperly drained EME of billions of dollars. (*Id.* ¶ 99.)

In the face of potential litigation, EIX settled with EME and a majority of EME's creditors on February 18, 2014. (*Id.* ¶ 104.) Under EME's Chapter 11 Plan of Reorganization, NRG Energy is to purchase EME's assets for $2.64 billion—an apparent fire-sale price. (*Id.* ¶ 105.) EME's $1.2 billion unused tax attributes will be placed into a trust for the benefit of EME's existing creditors. (*Id.* ¶ 107.) But under the Settlement Agreement, EIX must pay EME's creditors 50 percent of the amount of unused tax attributes—or $634 million. (*Id.* ¶¶ 108–09.) The Settlement Agreement also releases the individual defendants from liability. (*Id.* ¶ 113.)

/ / /

On February 12, 2014, Gordon filed this derivative action against the individual defendants purportedly on behalf of nominal defendant EIX, alleging one claim for breaches of fiduciary duties. (ECF No. 4.) She did not make a demand on EIX's board before filing suit. On May 9, 2014, Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 12.) Gordon timely opposed. (ECF No. 16.) That Motion is now before the Court for decision.

### III.  LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### IV.  DISCUSSION

Gordon alleges that it would be futile to make a demand on EIX's board of directors because of a majority of the directors face a substantial likelihood of liability

for causing EME to issue the 2007 dividends and for making the $183 million tax-sharing payment. But the Court finds that she has failed to establish a majority of the board's interestedness, intent to violate applicable law, or bad faith on a director-by-director basis sufficient to overcome the presumption that the board faithfully obeyed its fiduciary duties.

### A.     Demand requirement

Under California law, a "shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999). The demand prerequisite is "merely an extension of the business judgment rule, which dictates that judicial interference with corporate decision-making should be limited." *Shields v. Singleton*, 15 Cal. App. 4th 1611, 1619 (Ct. App. 1993) (internal quotation marks omitted).

Federal Rule of Civil Procedure 23.1 dictates several heightened pleading requirements with which a plaintiff seeking to bring a shareholder derivative action must comply. One requirement provides that the plaintiff must "state with particularity" her efforts to make a demand on the board, or, if she does not make a demand, "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Rule 23.1's pleading standards are not simply technical hurdles; rather, a plaintiff must strictly comply with them in order to "wrest control" of the issue from the board of directors. *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). But since Rule 23.1 only sets forth a procedural standard, a federal court must turn to the state of incorporation's law to determine the substantive standards for assessing demand futility. *Silicon Graphics*, 183 F.3d at 989–90.

California corporations law, incorporating Delaware law, establishes a presumption that directors were faithful to their fiduciary duties. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

Accordingly, to establish demand futility, the burden rests on the plaintiff to adduce facts that "show a reasonable doubt that (1) the directors are disinterested and independent, and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Oakland Raiders v. Nat'l Football League*, 93 Cal. App. 4th 572, 587 (Ct. App. 2001) (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)). This test in disjunctive, meaning that the plaintiff need only meet one prong in order to establish demand futility. *Charter Twp. of Clinton Police & Fire Ret. Sys. v. Martin*, 219 Cal. App. 4th 924, 935 (Ct. App. 2013).

In making the demand-futility inquiry, the plaintiff must apprise the court of facts specific to each director. *Potter*, 546 F.3d at 1058; *Shields*, 15 Cal. App. 4th at 1622. The court "must be able to determine on a director-by-director basis whether or not each possesses independence or disinterest such that he or she may fairly evaluate the challenged transaction." *Bader v. Anderson*, 179 Cal. App. 4th 775, 790 (Ct. App. 2009). General allegations regarding the directors' alleged actions and biases will not suffice. *Id.* at 790.

**B.     $183 million tax-sharing payment**

Gordon seeks to establish demand futility by demonstrating that a majority of EIX's board— Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, and White—face a substantial likelihood of liability for approving the tax-sharing payment, as she alleges that EME was insolvent at the time of the payment.

*1.     Not disinterested or independent*

A plaintiff may show a director's interest by demonstrating a "personal benefit or detriment" to the director resulting from the decision. *Martha Stewart*, 845 A.2d at 1049. The test for determining the primary basis upon which to measure the director's independence is "whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences." *Id.* But this is not a bright-line test; rather, independence is a "fact-specific

determination" that depends on the totality of the circumstances presented in a particular action. *Id.*

While a plaintiff may show a detriment to a director to establish a lack of independence, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient." *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). To preclude disinterestedness, the transaction must "be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Id.*

California law permits a corporation to include an exculpation provision in its articles of incorporation. Cal. Corp. Code § 204(a)(10). But a corporation may not discharge a director from liability for, among others, intentional misconduct, knowing violations of law, bad-faith actions, or receipt of improper personal benefits. *Id.* When a corporation includes an exculpation provision in its articles of incorporation, "a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003); *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995).

Defendants included a copy of EIX's Articles of Incorporation with their Motion, which includes a provision exculpating directors to the fullest extent allowed by California law.[2] (RJN Ex. A, at 2.) Defendants point out that Gordon has not alleged any facts showing any involvement by each director in EIX's decision to cause EME to pay the $183 million tax-sharing payment. They also argue that Gordon has not established that the payment was not due and owing under the tax-sharing agreements. Defendants indicate that in EME's 2010 and 2011 Forms 10-K, the company forecasted that it was going to make a tax-allocation payment of up to

---

[2] The Court may take judicial notice of a corporation's articles of incorporation. *Coal. for a Sustainable Delta v. F.E.M.A.*, 711 F. Supp. 2d 1152, 1170 n.5 (E.D. Cal. 2010); *see also* Fed. R. Evid. 201(b).

1 $185 million. They note that inclusion of the tax-sharing payment in the Creditors'
2 Committee's draft complaint presented to the bankruptcy court does not bolster
3 Gordon's allegations, because the Creditors only alleged that directors breached their
4 fiduciary duties as a result of misinterpreting the tax-sharing agreements. Finally,
5 Defendants reiterate that none of Plaintiff's allegations take Defendants outside the
6 scope of the exculpation provision.

7 Defendants further contend that Gordon has not pleaded any particularized facts
8 demonstrating any involvement by the particular Individual Defendants in the decision
9 or otherwise showing that particular directors did not act honestly, in good faith, or
10 with adequate information.

11 But Gordon asserts that she "need only allege particularized facts sufficient to
12 raise a reasonable doubt whether the Board's decision to knowingly cause EME to pay
13 the Tax Sharing Payment was . . . a fraudulent transfer that is not protected by the
14 business judgment rule." (Opp'n 17 (emphasis omitted).) She argues that she has
15 properly alleged the elements of a fraudulent transfer, though she does not bring a
16 specific claim for fraudulent transfer. Rather, she contends that the $183 million
17 payment was not, and could not, possibly be the product of a valid exercise of
18 business judgment. Gordon argues that the EIX board minutes confirm that the board
19 had affirmative knowledge regarding EME's financial condition, including its alleged
20 insolvency, since the board routinely discussed EME's financial plans and forecasts
21 leading up to the tax-sharing payment. Finally, Gordon contends that there is no
22 question that EME was insolvent, because its debts were greater than its assets.

23 Both parties agree that a parent corporation owes some sort of duty to the
24 subsidiary to not cause it to incur obligations while the subsidiary is insolvent. But
25 neither party fully establishes where this duty lies in Delaware law much less in
26 California corporation law—the law that applies to this action.

27 In fact, the Delaware Chancery Court has stated that under "settled principles of
28 Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned

subsidiaries or their creditors." *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006). The court went on to hypothesize that "[a]t most, one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting a parent corporation that they know will render the subsidiary unable to meet its legal obligations." *Id.* at 203.

While Delaware law might recognize some sort of duty owed by the directors of a parent corporation to a subsidiary, there is no indication that California follows this rule as well. While not a duty on behalf of a parent vis-à-vis a subsidiary, the California Court of Appeal has held that "under the current state of California law, there is no broad, paramount fiduciary duty of due care or loyalty that directors of an insolvent corporation owe the corporation's creditors solely because of a state of insolvency." *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1041 (Ct. App. 2009). One could reasonably conclude that if a subsidiary owes no fiduciary duty to its creditors, neither would the parent's directors who are even further removed from the subsidiary's creditors.[3] But even if there was a duty owed by the parent's directors, it is even more unclear whether such a duty would run to the subsidiary or only to the creditors.

Without EIX's directors owing EME some sort of duty not to make it incur an obligation while insolvent, Gordon cannot establish demand futility based on the $183 million tax-sharing payment. Further, since EIX's Articles of Incorporation include an exculpation law relieving directors from liability to the extent allowed under California Corporations Code section 204(a)(10), Gordon has to establish not simply a violation of fiduciary duties; rather, she must demonstrate that her selected majority of the board—Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang,

/ / /

---

[3] Defendants' citation to *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), does not further the fiduciary-duty inquiry. That case concerned directors' duties to an insolvent corporation—not the duty that a parent company's directors may owe to a subsidiary. *See id.* at 101.

Craver, Nogales, Schlosberg, and White—acted intentionally, knowingly, or in bad faith.

Even if the Court were to find that the EIX board owed EME some fiduciary duty, Gordon still has to adequately plead that EME was insolvent at the time that EME made the tax-sharing payment. Gordon simply alleges that "there is no doubt that the Board was intimately familiar with EME's financial crisis and was being continuously informed regarding EME's restructuring such that they knew that EME was insolvent and could not meet its obligations as they came due." (Compl. ¶ 88.) To underlie this insolvency conclusion, she states that at the time of the tax-sharing payment, "EME owed interest payments of $97.5 million due on certain of its senior notes on November 15, 2012 and $38.1 million on certain senior notes due December 15, 2012. $500 million of senior notes were additionally set to mature in 2013." (Compl. ¶ 84.) But simply alleging that EME had some outstanding obligations does not establish insolvency without knowing what EME's assets were at the time of the tax-sharing payment. Also, EIX's board caused EME to make the payment on September 27, 2012—but Gordon only speaks of debts due months after that date. Indeed, Gordon seems to recognize her pleading deficiency when she describes the outstanding obligations only as "looming debt problems." (*Id.* ¶ 85.)

Neither has Gordon alleged on a "director-by-director basis whether or not each possesses independence or disinterest such that he or she may fairly evaluate the challenged transaction." *Bader*, 179 Cal. App. 4th at 790. Rather, she lumps all Individual Defendants together or simply references the "EIX Board." (*See* Compl. ¶¶ 79 ("EIX caused EME to pay EIX approximately $183 million in a tax sharing payment . . . ."); 80 ("There was no credible reason for EIX to cause EME to make this payment under the Tax Sharing Agreement."); 81 ("The Individual Defendants simply decided to put EIX ahead of EME's creditors."); 84 ("There was no justification for EME to have made the Tax Sharing Payment since the Tax Sharing Payment was not required of EME under the Tax Sharing Agreements."); 85 ("[T]he

Board was well aware of EME's financial problems . . . ."); 86 ("The Board was particularly knowledgeable that EME could not meet its notes obligations when they came due having had numerous discussions regarding EME's notes debt.").) These generalized allegations preclude the Court from making findings regarding whether each director is "interested" as a result of the challenged payment.

### 2. *Not a valid exercise of business judgment*

To establish that a board's decision was not a valid exercise of business judgment, a plaintiff "must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005) (internal quotation marks omitted). A plaintiff may demonstrate a failure to act in good faith when, among others, "the fiduciary acts with the intent to violate applicable positive law." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)). Moreover, if a plaintiff fails to establish the first *Aronson* prong, a presumption arises that the challenged action was in fact a valid exercise of business judgment. *Martin*, 219 Cal. App. 4th at 935.

Gordon argues that EIX directors acted in bad faith by committing a fraudulent transfer through the $183 million tax-sharing payment. By "fraudulent transfer," Gordon apparently means a violation of the Bankruptcy Code, 11 U.S.C. § 548(a)(1). That section provides that a bankruptcy-estate trustee may avoid a transfer made or incurred by the debtor within two years prior to filing the bankruptcy petition if the debtor made or incurred the debt "with actual intent to hinder, delay, or defraud" an entity to which the debtor was indebted or "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1). Additionally, the debtor must have been insolvent on the date that the transfer was made. *Id.* § 548(a)(1)(b)(ii)(I). The Bankruptcy Code defines "insolvent" as when

"the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32).

As discussed above, Gordon has not established through her allegations, taking them all as true, that EME was insolvent at the time of the $183 million tax-sharing payment. The crucial date for this financial-status inquiry is September 27, 2012—the date that EME transferred the funds—not several months later. This pleading inadequacy alone is fatal to Gordon's demand-futility argument based on the payment.

Once more, at the demand-futility stage, the merits underlying the derivative suit are not the main issue. Instead, Gordon must adequately allege that the directors acted with intent to violate positive law—here, 11 U.S.C. § 548. It is also unclear whether § 548 is even properly the subject of a breach-of-fiduciary-duty claim. The section does not set forth a criminal penalty or civil liability; rather, it simply empowers a "trustee" to set aside a fraudulent transfer with no other culpability or standard of conduct attached.

The Court therefore finds that Gordon has not established either that a majority of EIX's board is interested as a result of the $183 million tax-sharing payment or that the transaction was not the product of a valid exercise of business judgment.

**C.      $924 million in dividend payments**

Defendants next argue that Gordon's allegations that EME did not receive any consideration in exchange for the dividend payments ultimately paid to MEHC do not show that the directors face a substantial likelihood of liability, because that is necessarily the case in every dividend payment from a subsidiary to a parent. The dividend payment will always benefit the recipient (the parent) at the expense of the payor (the subsidiary).

Defendants also contend that EIX's directors did not owe EME any fiduciary duties, because a parent-subsidiary relationship only triggers fiduciary duties when the subsidiary is insolvent. But they assert that Gordon failed to adequately plead that EME was insolvent at the time of the dividend payments in 2007. They calculate that

even after the challenged dividend payments, EME still had almost $2 billion in shareholder equity. They argue that the potential capital expenditures at Midwest Generation's Illinois plant were only "estimated," and EME was going to incur them over a 10-year period from 2008 to 2018 with the bulk of them not until 2012. (*See* RJN Ex. B (EME's 2007 Form 10-K).)

Individual Defendants also argue that the dividend payments cannot serve as the basis for Gordon's breach claims, because the applicable four-year statute of limitations bars them. *See* Cal. Civ. Proc. Code § 343.

Lastly, Defendants contend that Gordon did not plead particularized facts demonstrating the knowledge or involvement of any particular director in EIX's decision to cause EME to make the dividend payments.

Gordon does not heavily argue the sufficiency of her dividend-based demand futility allegations. But she again argues that a majority of EIX's board— Bindra, Córdova, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, and White—are interested because they face a substantial likelihood of liability for approving the dividends. She disputes that the statute of limitations bars any reliance upon the challenged dividend payments, arguing that California's discovery rule applies to delay the running of the limitations period. Gordon contends that it was not possible for her to know about Defendants' alleged scheme of having EME pay the dividends until the Creditors' Committee filed its July 31, 2013 motion seeking to sue EIX and each of the Individual Defendants. She asserts that the 2007 Form 10-K only informed the public of EME's financial condition at the time of the dividends but did not reveal any wrongdoing.

Gordon states that she agrees with the Individual Defendants that California's "three-year statute of limitations applies to this action." (Opp'n 24.) But in fact, Defendants contend that a four-year statute of limitations applies to this action. *See* Cal. Civ. Proc. Code § 343; *In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1037 (N.D. Cal. 2009) (finding that California's four-year statute of

limitations applies to breach-of-fiduciary-duty claims). In any event, EME issued the challenged dividends in 2007—well beyond either limitations period.

But under the discovery rule, "the statute of limitations does not begin to run until the plaintiff either (1) actually discovers the injury and its cause or (2) could have discovered the injury and its cause through the exercise of reasonable diligence." *Angeles Chem. Co. v. Spencer & Jones*, 44 Cal. App. 4th 112, 120 (Ct. App. 1996); *see also Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988).

While Defendants argue that the facts contained in Form 10-K put Gordon on inquiry notice of the directors' alleged breach, the Court is unable to conclude at this nascent stage of the litigation (1) what facts Gordon should have been aware of to support her fiduciary-duty claims, and (2) what facts were presented in the Form 10-K or other public disclosures that would have given her that information through a reasonable investigation. The Court therefore takes as true at this point only Gordon's allegation that she could not, and did not, find out about the alleged breaches until the Creditors' Committee submitted their draft complaint to the bankruptcy court on July 31, 2013—thus temporarily saving her dividend-based arguments from the statute of limitations.

But Gordon expends so much effort arguing the statute-of-limitations issue that she ignores the elephant in the room: what the directors allegedly did wrong in causing EME to make the two dividend payments in 2007. She cannot establish that these amounts were fraudulent transfers, as they occurred far outside § 548's two-year window before EME filed for bankruptcy. Gordon also has not established that EME was insolvent at the time of the dividend payments. In fact, she states that in EMEs' 2007 Form 10-K—which was necessarily filed in early 2008—EME reported $2 billion in assets over its total liabilities—far from being insolvent. (*See* Compl. ¶ 55.) She alleges that EME had senior notes due in 2008, but those of course were due well after the dividend payments. (*See id.* ¶ 56.) Gordon seemingly admits that

///

she has not adequately pleaded that EME was insolvent, because she alleges that EME was only on the "brink of insolvency, if not actually insolvent." (*Id.* ¶ 64.)

Moreover, Gordon alleges that the dividends were "unfair to EME because it received no consideration from MEHC from this exchange." (Compl. ¶ 63.) But there are several problems with this statement. First, a general notion of "unfairness" is not a relevant criterion for assessing whether the EIX directors breached their fiduciary duties. Second, since California courts do not appear to have addressed the issue, EIX owed no duty to EME or its creditors—especially since Gordon has not established any insolvency at the time of the dividend payments. Finally, due again to EIX's exculpation provision in its Articles of Incorporation, Gordon may not establish demand futility simply be demonstrating that the directors allegedly breached a duty. Instead, the directors had to have acted in bad faith or with intent to violate applicable law. A simple allegation of unfairness standing alone does not overcome the exculpation-provision's pleading hurdle.

The Court consequently finds that Gordon has not demonstrated demand futility on the basis of the 2007 dividend payments.

**D. Defendants named in the Creditors Committee's draft complaint**

Gordon alleges in her Complaint that one basis for why Bindra, Córodva, Freeman, Olson, Sutton, Taylor, Chang, Craver, Nogales, Schlosberg, and White face a substantial likelihood of liability is because they were named in the Creditors' Committee's draft complaint. (Compl. ¶ 122(c).)

Defendants argue that Plaintiff in no way indicates how merely being named in a draft complaint somehow subjects these particular defendants to an additional likelihood of liability. They further contend that no additional liability stemmed from EIX paying the settlement agreement.

Gordon fails to argue this issue in her Opposition—and for good reason. Defendants are correct that merely being named in a lawsuit establishes nothing. What's more, the Creditors' Committee never filed its proposed complaint, so the

directors were never subject to any potential liability. Gordon wholly fails to establish any basis for demand futility on this ground.

**E.      Craver and Olson's independence**

Gordon further alleges that Craver's position as EIX's Chairman, President, and CEO precludes his independence from Chang, Nogales, Taylor, and White, because these defendants must approve his compensation. Since Craver stands to earn "millions of dollars in annual salary, bonuses, and other compensation," he cannot be independent from these board members. (Compl. ¶ 122(e).) Additionally, Gordon alleges that since Olson is a partner at Munger, Tolles & Olson—a law firm which represents EIX and therefore receives fees from the company—he lacks independence from the other EIX directors. (*Id.* ¶ 122(f).)

In her Opposition, Gordon states "[i]t is black letter law that with respect to demand futility purposes, defendant Carver [*sic*] as EIX's Chairman, President and CEO lacks independence." (Opp'n 20 n.13 (citing *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at *7 (Del. Ch. 2011)).) But this point is hardly "black letter law." The case Gordon cites for the proposition is unpublished, so it has no binding precedential value. Second, the court in *Goldman Sachs* did not state that officers who also serve as directors lack independence as a matter of law. Finally, that case arose under Delaware law; Gordon has not attempted to establish whether officers in similar positions lack independence as a matter of California law.

In fact, published Delaware law contradicts Gordon's point. In *In re Walt Disney Company Derivative Litigation*, the Delaware Chancery Court stated that "directors do not necessarily lose their ability to exercise independent business judgment merely by virtue of their being officers." 731 A.2d 342, 357 (Del. Ch. 1998), *reversed in part on other grounds by Brehm*, 746 A.2d 244. Additionally, to the extent that Gordon alleges that Craver lacks independence due to receiving his salary, the Delaware Supreme Court has already held that "such allegations, without

more, do not establish any financial interest." *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d 244. The Court therefore is unable to find that Craver lacks independence merely because he also serves as EIX's President and CEO.

Gordon also does not argue in her opposition how Olson allegedly lacks independence from the rest of the EIX board merely because he is a partner at Munger, Tolles & Olson, a law firm that receives "millions of dollars a year" in compensation for legal services provided to EIX. (*See* Compl. ¶ 122(f).) There is a presumption that directors were faithful to their fiduciary duties, *Martha Stewart*, 845 A.2d at 1048, so a terse allegation that "therefore Olson lacks independence from the other directors of EIX" does little to further the demand-futility inquiry.

## V. CONCLUSION

California law recognizes that a corporation's decision-making power reposes soundly in the board's discretion, limited only by the directors' fiduciary duties of loyalty and good faith. *Shields*, 15 Cal. App. 4th at 1619. The business-judgment rule precludes a court from reviewing the propriety of a particular board action absent some basis to believe that extraneous considerations motivated the directors or that the directors acted in bad faith. While a shareholder like Gordon may be deeply dissatisfied with the board's ultimate decisions, recourse is limited unless the shareholder complies with the exacting demand-futility requirements. Since Gordon has failed to uphold her burden, the Court **GRANTS** Defendants' Motion to Dismiss. (ECF No. 12.) If Gordon may do so without violating Rule 11(b), she may amend her Complaint within 14 days consistent with the findings in this Order.

**IT IS SO ORDERED.**

June 5, 2014

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**